**In the Matter of ARLAN'S DEPARTMENT STORES, INC., Debtor.**

**No. 73 B 468.**

United States District Court,
S. D. New York.

Dec. 6, 1978.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for trustee by William W. Golub, and Jane S. Solomon, New York City.

Securities and Exchange Commission, New York City by Marvin E. Jacob, Associate Regional Administrator, Lawrence J. Toscano, Asst. Regional Administrator, Jerome Feller, and Barry J. Schwartz, New York City.

Shea, Gould, Climenko & Casey, New York City, personal counsel to trustee by Martin I. Shelton, New York City.

Ballon, Stoll & Itzler, New York City, for debtor by Frederick E. M. Ballon, and Ronald S. Itzler, New York City.

Weil, Gotshal & Manges, New York City, for Lappin, Rosen, Goldberg, Slavet, Levenson, Wekstein, Inc. by William J. Rochelle, III, New York City.

Sidney S. Wolchok, New York City, Sp. Counsel to debtor and trustee.

Leinwand, Maron, Hendler & Krause, New York City, for Creditors' Committee by Elliot L. Krause, New York City.

Silk, Slonim & Young, P. C., New York City, Sp. Counsel to debtor and trustee by Robert H. Silk, New York City.

Rice, Rice & Gilbert, Detroit, Mich., Sp. Counsel to debtor and trustee by Allan W. Gilbert, Detroit, Mich.

Ruben, Schwartz & Silverberg, New York City, for Creditors' Committee by Seymour J. Silberberg, New York City.

Wolf, Block, Schorr & Solis-Cohen, by David M. Doret, Philadelphia, Pa., Hurwitz & Hurwitz by Harold Hurwitz, New Bedford, Mass., Miller, Hickey & De Bruyne, Ltd. by Francis E. Hickey, Rockford, Ill., Rudofsky & Meo by Jack L. Rudofsky, Encino, Cal., Albert F. Coombes, Chatsworth, Cal., Frank M. Coyne, Madison, Wis., Honigman, Miller, Schwartz & Cohen by Sheldon S. Toll, Detroit, Mich., Sp. Counsel to trustee.

## OPINION

ROBERT L. CARTER, District Judge.

On May 14, 1973, Arlan's Department Stores, Inc. ("Arlan's") filed a petition for

an arrangement under Chapter XI of the Bankruptcy Act ("Act"). By order of Bankruptcy Judge Roy Babitt, Arlan's was permitted to continue operation of its business as a debtor in possession. Arlan's Chapter XI petition was followed in June and July by similar petitions from 40 of the company's wholly-owned subsidiaries. These entities, like their parent, were authorized to continue operations as debtors in possession.

Arlan's was a multi-state chain store selling general retail merchandise. In 1970 it had some 119 stores, but during that year it began to experience heavy losses which continued unabated until its reported losses for 3¼ fiscal years ending in April, 1973 reached $65 million. During this period it liquidated 39% of its stores, and when the Chapter XI petition was filed, it had reduced its stores to 70 and at the time had on its payroll approximately 4,000 employees. The business appeared to be substantial despite these recent setbacks. However, a huge indebtedness had been incurred. It owed $35 million to about 15,000 creditors in the trade, some $21 million to institutional lenders and faced a potential liability of about $15 million for breaches of lease agreements with various landlords. It had outstanding public securities of 2,775,-414 shares of common stock held by some 6,000 shareholders, and 6% convertible subordinated debentures in the principal amount of $15 million held by roughly 725 debenture holders.

The dreary downturn in business continued during the Chapter XI phase, and Arlan's decided that only drastic measures would turn the tide. Without court authorization, it hired Rollin Binzer as a promotional consultant. He proposed a project called "Mission Impossible" which involved altering the physical layout of the stores, offering new and different types of merchandise, and undertaking substantial advertising and promotional efforts to attract business. The project was aimed at reaping considerable profits during the 1973 Christmas shopping season. Despite the huge expenditure of funds, time and effort, the project failed.

In mid-November, 1973, counsel for the Securities and Exchange Commission ("Commission") advised Arlan's general counsel, Ballon, Stoll & Itzler, that it would seek to transfer the matter from Chapter XI to Chapter X. Counsel persuaded the Commission to defer that move until after Christmas on the representation that the upcoming Christmas season was crucial to Arlan's rehabilitation and the transfer from Chapter XI to Chapter X might be harmful to Arlan's efforts during that critical period. Not having advised the court, neither counsel nor the debtor felt the need to advise the Commission about the "Mission Impossible" project.

In early January, 1974, the Commission moved for the transfer to Chapter X. That motion was granted in February, 1974. In its memorandum opinion granting the Commission's motion, reported at 373 F.Supp. 520, the court unknowingly made a prophetic announcement: "Hopefully, the proceedings can go forward expeditiously and with minimal expense and if the debtor is not suffering from terminal financial ills, a successful rehabilitation will occur." *Id.* at 526.

However, Arlan's was at that point terminally ill and could not be saved. An amended petition was filed in March, 1974, to meet Chapter X requirements. Irving Bernstein was appointed and confirmed as trustee, and Rosenman, Colin, Kaye, Petschek, Freund & Emil, now succeeded by Rosenman, Colin, Freund, Lewis & Cohen, was appointed counsel to the trustee.

When the Chapter X proceedings began, the operating stores, without authorization of the Chapter XI court, had been reduced to 35, and the debtor had already decided to make a further retrenchment to 22 stores. That latter decision was concurred in by the trustee. In April, 1974, the court ordered the 13 stores closed, and subsequent closings were authorized reducing the operating stores to only 10 by the 1974 Christmas shopping season. The 1974 Christmas season sales were below projections. In January, 1975, low inventories, cash shortages

and inability to secure normal credit terms left the trustee with no option but to recommend a complete shut down and liquidation of the debtor's business. On January 29, 1975, the court authorized the sale of the assets of all the 10 remaining stores and declared the debtor insolvent. The inventory and fixtures in the 10 stores and the debtor's interest in real property were disposed of. A plan of orderly liquidation was approved and confirmed. The estate now consists of $3.7 million in cash assets against $170 million in liabilities, and funds are available only for payment of administrative claims, priority wage claims and a small dividend on priority tax claims.

The Commission has been a party to this action since the transfer to Chapter X pursuant to section 208 of the Act, 11 U.S.C. § 608. Its help and guidance and that of the counsel to the trustee has been of great assistance to the court throughout these protracted proceedings. Both could be relied upon, when requested, to provide a disinterested perspective of the events about which the court needed to be informed.

The court now faces the exceedingly graceless task of deciding upon fee allowances being sought. Because of the unsavory nature of the activities of some of the fiduciaries in this case, the task facing the court becomes even more dispiriting than usual. At the court's request, the Commission studied all the final allowance applications, including those of the trustee, his counsel, special attorneys and accountants, and attorneys and accountants and a creditors' committee for the debtor. The request made for services rendered is in excess of $2 million which includes retainers and court authorized interim compensation of $301,994, leaving a total of $1¼ million being applied for at this time. In addition, there is a request for $30,946.33 in reimbursements. The Commission recommends final allowances of $1,105,117 of which $75,-000 has already been paid as an interim allowance. In addition, it recommends that $313,082.53 previously received by the trustee and attorneys for the debtor be ordered returned to the estate with interest.

*Determination*

The Commission has made a thorough examination and careful analysis of all the applications. As a disinterested agency skilled and experienced in reorganization matters, its recommendations are ordinarily entitled to great weight. *In re Farrington Mfg. Co.,* 540 F.2d 653 (4th Cir. 1976); *In re Imperial "400" National, Inc.,* 432 F.2d 232 (3d Cir. 1970); *In re Coast Investors, Inc.,* 388 F.2d 622 (9th Cir. 1968); *Finn v. Childs Co.,* 181 F.2d 431, 438 (2d Cir. 1950); *In re Investors Funding Corp.,* 422 F.Supp. 461 (S.D.N.Y.1976) .(Bonsal, J.), *modified,* 547 F.2d 13 (2d Cir. 1976). In the main the Commission's recommendations are sufficiently documented and supported by the case law so that there is no basis for disagreement, and in such instances the agency's recommendations have been adopted.

However, there have been divergences from the Commission's recommendations, for in the final analysis the determination is the court's responsibility. The court has been accorded broad discretion to accomplish the unpleasant task which must now be faced, *Dickinson Industrial Site v. Cowan,* 309 U.S. 382, 60 S.Ct. 595, 84 L.Ed. 819 (1940), and its decision is subject to interference only on a showing of an abuse of discretion or the application of incorrect legal principles. *See In re First Colonial Corp. of America,* .544 F.2d 1291 (5th Cir. 1977), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).

The court's determination is controlled by the following considerations: the level of skill and time required to perform the work that had to be done; the value of the required services; the results achieved; the size of the estate and the burden the latter can safely bear; the professional standing, ability and experience of the applicant and the reasonableness of the award in the context of the size and value of the estate as measured pursuant to a concept of reasonable economy of administration. *See e. g., Surface Transit, Inc. v. Saxe, Bacon &*

*O'Shea,* 266 F.2d 862, 865 (2d Cir.), *cert. denied,* 361 U.S. 862, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959); *In re the First Colonial Corp. of America, supra.* The awards must be fair, neither so high that the res the proceedings is designed to protect is consumed nor so parsimonious as to discourage the active participation of competent counsel. *See In re Farrington Mfg. Co., supra; In re Mabson Lumber Co.,* 394 F.2d 23 (2d Cir. 1968).

With respect to the Commission's recommendation as to the final allowance for the trustee's general counsel, it seems to the court that the scale has been tipped too far towards parsimoniousness and that the Commission's recommendations in this instance are flawed by inconsistency. It recommends an hourly rate of $51 and $50 for several other applicants, but would limit the trustee's general counsel to $42.50. This inconsistency occurs because the Commission was looking at the total award involved, and it recommended the higher hourly rate for other applicants because so little was being sought, while the trustee's counsel is seeking a substantial fee. While the total applied for cannot be discounted, it would be unfair to penalize counsel because it was called upon to expend so much time in fulfilling the obligations it was asked to assume.

*The Trustee*

Irving Bernstein, who served as trustee from March 18, 1974, until his resignation was accepted and a successor appointed by order dated May 12, 1978, seeks a final allowance of $250,000 which includes $72,000 already paid as interim allowances. At the beginning of his assignment Bernstein worked to save the business, and his application, although unsupported by time records, indicates that he spent 40 hours a week in the first year trying to make a go of the business. Between March, 1974, and January, 1975, the court is convinced that the trustee's claim of 40 hours per week is accurate. Thereafter, however, he was concerned solely with the orderly wind up of the estate, and it is difficult to understand how the claimed 40 hours per week from March 1, 1975, to November 30, 1975, and an average of 25 hours a week from December 1, 1975, through September 30, 1977, were required in respect of the needs of the estate. In any event, the excess of time spent or claimed is not the critical issue here. A far more unpleasant issue must be aired.

From the very commencement of his role as trustee on March 18, 1974, through March 2, 1978, Bernstein paid substantial sums to himself out of Arlan's estate as reimbursement for expenses. None of these reimbursements was authorized by the court. No authorization was ever sought, and the trustee did not disclose these payments in his four applications for interim allowances of $18,000, awarded by orders dated June 21, September 20 and December 20, 1974, and March 21, 1975. Indeed, the purpose for the interim allowance was to reimburse the trustee for expenses and out-of-pocket disbursements, for which, as is now revealed, reimbursement had already been received by unauthorized dipping into the funds of the estate. The trustee's counsel in reviewing the records came across various payments which seemed unrelated to the estate and included family vacation trips and personal expenditures and brought the matter to the court's attention. Touche, Ross & Co. was employed at the direction of the court and at Bernstein's expense, as special accountants. Their review, which was not an in-depth examination, revealed that some $63,935.85 had been taken from the estate by the trustee without proper authorization. While the trustee does not concede that the total amount constituted unauthorized funds taken, he has returned $63,935.85 to Arlan's, and I understand will not contest the validity of the Touche, Ross findings. Unfortunately, the return of the funds, even assuming that a more thorough investigation may not reveal additional improprieties, does not suffice.

A trustee, particularly one appointed by the court, occupies a position of public trust. The estate for which he is given responsibility is being administered by him

under court aegis. The court is required to rely on his judgment, his integrity and honesty. In taking unauthorized and undisclosed funds from the estate and converting them to his own use, Bernstein committed a grave breach of his fiduciary obligations. Not only has his conduct fallen below the exacting standard applicable to fiduciaries, it cannot be squared with the lower yardstick of the marketplace. The funds of the estate were not for Bernstein's personal use, but only for authorized purposes in connection with the administration of the debtor's property. Even if there had been no question concerning misapplication to the trustee's personal use and the funds had been shown to have been properly spent, the fact that the taking had been unauthorized and undisclosed would, itself, constitute a breach of Bernstein's fiduciary obligation. In that hypothetical situation the breach might only have been considered a technical one, but where a limited investigation reveals diversion of monies to the trustee's personal use, as here, there is actual and active wrongdoing.

The court, of course, may deny all compensation to the trustee since any award is within the court's discretion, see e. g., Dickinson Industrial Site v. Cowan, supra; In re Barry Yao Co., 175 F.Supp. 726 (S.D.Cal. 1959), rev'd on other grounds, 286 F.2d 299 (9th Cir. 1961); In re J. H. Newport Co., 84 F.Supp. 13 (E.D.Pa.1949), and it seems appropriate to do so in this case. In connection with the court's power to confirm a plan of reorganization, section 221(4) of the Act, 11 U.S.C. § 621(4) subjects all compensation to court approval. Implicit in that authority is the power to order funds already paid out to be returned. See 6A Collier on Bankruptcy ¶ 11.09 at pp. 244–48 (14th ed. 1977). See also Leiman v. Guttman, 336 U.S. 1, 5–8, 69 S.Ct. 371, 93 L.Ed. 453 (1949). It seems appropriate that the latter be done as well. The trustee, on four separate occasions, came to the court seeking and receiving interim allowances of $18,000 each. On none of these occasions was it disclosed that the trustee had been taking funds from the estate to meet purported expenses which was the stated purpose of the applications for interim allowances. The interim allowances were thus obtained under false pretenses. Had all the facts been known to the court at the time, the interim allowance would not have been approved. Accordingly, the trustee's application for a final allowance of $250,000 is denied. He is denied any award as trustee and is ordered to restore to the estate with interest the $72,000 in interim allowances heretofore received.

### The Application of Ballon, Stoll & Itzler, Attorneys for the Debtor

Applicant was retained by order dated May 14, 1973, of Bankruptcy Judge Babitt as Arlan's general counsel in the Chapter XI proceedings. Applicant applies for a final allowance of $250,000 to which it credits payment already received of $129,993.98 leaving a balance of $120,006.02 now being sought, plus $4,352.24 in reimbursement for expenses.

One day prior to the filing of the Chapter XI petition, that is on May 13, 1973, applicant states that it received a $124,993.98 retainer in cash. Payment of this retainer on the eve of the filing of the Chapter XI petition was made in cash collected from the cash registers of various of the debtor's stores in the Detroit, Michigan area. In January, 1975, the Chapter X trustee moved under section 60(d) of the Act, 11 U.S.C. § 96(d) to recover the portion of the cash retainer payment exceeding a reasonable amount for pre-petition services in contemplation of the filing of the Chapter XI petition.

At the final allowance hearing on November 18, 1977, counsel for the Chapter X trustee introduced a handwritten receipt signed by Ronald S. Itzler, Esq., the applicant's partner in charge of the Arlan's matter, acknowledging payment by Arlan's of $104,992 in cash, and a May 14, 1973 receipt by Itzler acknowledging payment of $124,993.98 was also introduced at the hearing. According to Itzler's recollection recounted at the November 18, 1977 hearing, the money was delivered to him by representatives of Arlan's at his office on Sunday evening,

May 13, 1973. He stayed at his office with an armed guard and counted the money, arriving at the $104,000 figure. The next morning the money was delivered to the bank and its count came to $124,993.98 which is the sum relied upon. (See pp. 746–47 Transcript, Nov. 18, 1977 hearing).

Applicant neglected to disclose receipt of the retainer in the Chapter XI petition or in its affidavit annexed thereto. General Order in Bankruptcy 44, in effect at the time, requires that all attorneys' connections with the debtor be disclosed and Bankruptcy Rule 215 which superseded General Order 44 continues this requirement. Chapter XI, Rule 11–22 makes applicable Rule 215 to Chapter XI cases. The Commission finds the manner in which the retainer was paid a basis for adverse comment. In a March 22, 1978 letter to the court, the applicant explains that when the necessity for filing the Chapter XI petition became apparent, the law firm advised Arlan's that it would require a $125,000 retaining fee to file the petition. I find nothing untowards *per se* in the fee, its size or the manner of its payment. Lawyers are not held to a standard of self-sacrifice. They are entitled to ensure payment for use of their professional skills. The payment, however, should have been disclosed to the court at the onset of the Chapter XI proceedings. It was disclosed some six months later in Arlan's consolidated schedules and statement of affairs filed on November 28, 1973. Ballon contends it had no obligation to advise the Chapter XI court at the outset concerning the retainer it received. That argument, however, flies in the teeth of the plain language of General Order 44.

During July, 1973, Itzler received an additional $5,000 evidenced by another handwritten receipt. This payment was not disclosed in the November 28, 1973 consolidated schedules and statement of affairs. Nor was any reference made to it in the fee application filed in February, 1975. It surfaced at the November 18, 1977 hearing on fee applications and is included in the amended fee petition. The failure to disclose the payment is said to have been inadvertent, but that explanation misses the point. In July, 1973, Arlan's was in Chapter XI proceedings before Bankruptcy Judge Babitt. Whatever Ballon's doubt about its being required to reveal to the court at the commencement of Chapter XI proceedings that Arlan's had paid it a retainer, it cannot and, indeed, does not attempt to argue that it could receive any funds from the debtor in Chapter XI without court authorization. It seeks to obfuscate the real issue with the irrelevant. Inadvertence is certainly not an apt description of what amounted to a direct violation of the duties and responsibilities of a Chapter XI general counsel. Only some 4 years after that unauthorized payment was made was it finally disclosed.

Several years before the Chapter XI petition was filed in these superseded proceedings, Arlan's engaged the applicant to determine whether a Chapter XI petition should be filed. The firm's advice was that such a filing then was premature. For this engagement it was paid $5,000. By letter dated April 12, 1971, applicant entered into agreement with Arlan's then general counsel, Finley, Kumble, Underberg, Roth & Grutman, now succeeded by Finley, Kumble, Wagner, Heine & Underberg ("Finley"), that in the event Arlan's filed a Chapter XI petition, Finley would use its best offices to cause the appointment of applicant as counsel for Arlan's in the Chapter XI proceedings, and Ballon would, in consideration thereof, share the court awarded fee on a ⅓ to Finley ⅔ to applicant basis, with the understanding that Finley would perform ⅓ of the work. In addition, applicant agreed to use its best efforts to obtain Finley's appointment as special counsel to Arlan's in the Chapter XI proceedings with Finley retaining all fees awarded to it.

Applicant was appointed Arlan's general counsel by Bankruptcy Judge Babitt in the Chapter XI proceedings, but apparently did not live up to its obligations to Finley. Alleging a breach of the agreement, Finley commenced a lawsuit against the applicant in the Supreme Court, New York County, in July, 1973, seeking to recover $41,666.66, representing about ⅓ of the $125,000 cash

retainer received by applicant in May, 1973, from Arlan's. The litigation was settled by payment to Finley of $22,500, and a stipulation discontinuing the action was filed on April 11, 1974.

As indicated in the discussion of the $125,000 retainer and the failure to disclose it in the May 14, 1973 Chapter XI petition, General Bankruptcy Order 44, superseded by Rule 215, requires the disclosure of all connections between the debtor or any other party in interest and their attorneys. The applicant's affidavit to support Arlan's application to authorize counsel's retention disclaimed any connection with Arlan's, "its creditors or any other party in interest or their respective attorneys," and states that Arlan's choice of applicant as counsel was "because of our reputation in the field of debtor rehabilitation."

■ The view by the Commission that the agreement with Finley was patently improper is certainly supportable. Applicant contends that the agreement was nothing more than a forwarding fee arrangement. Appointments in bankruptcy matters are not to be subject to deals among counsel or other persons of influence. *In re Marraccini*, 187 F.Supp. 610, 613 (N.D.Cal. 1960). In addition, any agreement to split fees is unlawful. *Crites, Inc. v. Prudential Ins. Co. of America*, 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356 (1944). Had the Chapter XI court taken this view of the agreement, applicant would not have been confirmed as the debtor's general counsel in the Chapter XI proceedings. The court however was unaware of the agreement and had no opportunity to determine whether it was an illegal agreement to split fees as the Commission contends or a forwarding agent accommodation as Ballon asserts.

The failure to disclose the agreement in its fee application of February, 1975, would appear to be a direct violation of section 62(c) of the Bankruptcy Act, 11 U.S.C. § 102(c) which bars an agreement to share fees except with a law partner or forwarding attorney, and of section 62(d), 11 U.S.C. § 102(d) which requires an affirmative

statement under oath as to whether any fee sharing agreement exists. The affidavit annexed to the February, 1975 fee application states that no such agreement exists. The affidavit goes on to state that Finley had brought suit against the applicant on the grounds that "Finley was entitled to a forwarding fee as a result of that firm's recommendation [of the applicant] to the debtor in connection with these proceedings," and the settlement for $22,500 is disclosed.

Even according applicant the benefit of the doubt that the agreement between it and Finley was due to the latter's role as forwarding agent, the letter agreement which seems to be the best evidence of what the agreement involved should have been disclosed to the court. The failure to do so, and the applicant's unilateral description of Finley as forwarding attorney are unacceptable. The letter agreement does not appear to me to be susceptible to that interpretation, nor would one consider that interpretation to be a fair reading of the papers filed in the state court litigation. In any event, the fault lies in the failure to disclose the agreement to the court.

Ballon strenuously contests the Commission's conclusions and recommendations. It contends that the Commission has misstated the facts and misread the law, but spends most of its efforts in response to the Commission arguing about how it was right about the matter being kept in Chapter XI and the Commission wrong in transferring it to Chapter X and about its efforts on the debtor's behalf which it believes would have succeeded in saving Arlan's as a viable operation. Whatever the merits of these arguments, they certainly are irrelevant to the task of meeting the obstacles the Commission's revelations require the applicant to overcome. We need not involve ourselves in a debate over the truth of the facts as alleged by the Commission and contested by Ballon—whether the failure to comply with General Order 44 compels a denial of compensation or merely authorizes it in the court's discretion, the dispute over the extent of Ballon's efforts on behalf of

the debtor and the effect to be given to the inadvertent failure to report payment of $5,000 during the Chapter XI proceedings, whether the timing and method of the cash payment of the $125,000 retainer was per se unsavory or unethical, and whether the Finley agreement was one to split fees or to pay a forwarding agent. We put those considerations aside.

Indeed, we assume for our purposes that there is nothing untowards about the retainer or its receipt, and that failure to report the payment of the $5,000 was inadvertent and that the Finley agreement was for a forwarding agent's fee. What is inescapable is that applicant did not make a full and complete disclosure when required and obtained payment from the debtor without court authorization. Ballon had had contact with Arlan's earlier and with Finley, then Arlan's counsel, and made no mention of these facts in its application. It was under an obligation to make a full disclosure. It did not do so. It had an agreement with Finley to share ⅓ of its fee if appointed in Chapter XI with Finley, if the latter did ⅓ of the work. It did not disclose that agreement to the court. It was required to do so.

Ballon states that it did not because the purpose of the disclosure requirement is to ferret out all connections with adverse interests, and it knew of no such interests by Finley until 2 years subsequent to commencement of the Chapter XI proceedings. While the purpose for the disclosure is clear, the court, whose obligation it is to approve or disapprove the debtor's choice of counsel, must make the determination whether adverse interests are present which warrant disapproval of the appointment. The court was denied that opportunity and Ballon's unilateral judgmental conclusions are not adequate substitutes for the court's. Ballon interprets the agreement as payment for a forwarding attorney. I am not certain the bankruptcy judge would have agreed. At any rate, Ballon was obligated to make a full disclosure of the letter agreement with Finley by filing it with the court. It is perfectly legitimate for applicant to give whatever interpretation to the agreement it chooses, but the agreement should have been before the court.

The $5,000 payment without court authority was simply improper. At the time the proceedings were in Chapter XI, and it was for the court to determine what fees, if any, should be paid. Finally, however one views the $125,000 retainer, it should have been disclosed at the time approval of the appointment was sought.

Ballon's apparent disclaimer that it is an officer of the court by nature of its Chapter XI general counsel designation is surprising. The debtor selects his attorney but under General Order 44 and now Rule 215, "the court is given a voice in the selection because the attorney is appointed by order of the court only after he is carefully examined by the court. The order is designed to protect the bankrupt's estate." *In re Chocklett*, 274 F.Supp. 821, 823 (W.D.Va. 1967). In this case, the court did not have all the facts to accomplish the close scrutiny General Order 44 required. On being appointed by order of the court, no matter from what source came the initial impetus, applicant surely became a court officer and fiduciary.

■ While, at least for purposes of this case, I will accept the reading of General Order 44 subsequent to the 1933 amendment, *see In re Itemlab Inc.*, 257 F.Supp. 764 (E.D.N.Y.1966), that the deficiencies indicated do not necessarily require or compel a denial of compensation, it seems to me that the totality of Ballon's failure of full disclosure leaves no other recourse. The court was entitled and indeed needed to have all the facts about Ballon's relationship to the debtor, the retainer it obtained, and its agreement with Finley before it could have been able to make a fair appraisal of Ballon's fitness for the appointment. That it may well have named Ballon general counsel even with a full disclosure is beside the point. Moreover, the taking of $5,000 to which it had no right except by court order and "inadvertently" failing to disclose it is a patent violation of the law and of Ballon's obligations as an attorney.

The appointment, accordingly, is tainted. Under the circumstances, an order awarding no fee to Ballon and requiring a return to the estate of the $129,993.98 heretofore received with interest is the appropriate prophylactic measure to be employed. There are additional deficiencies discussed by the Commission, but in view of the above holding and its basis, they appear irrelevant.

*The Application of Lappin, Rosen, Goldberg, Slavet, Levenson, Wekstein, Inc., ("Lappin") Special Counsel for the Debtor*

Lappin, a Boston firm, retained as special real estate counsel by order dated May 18, 1973, and as special securities counsel by order dated August 23, 1973, requests a final allowance of $93,440 for services rendered for the most part in the Chapter XI proceedings. The estate is credited with a $25,000 cash retainer received on May 4, 1973. The $25,000 retainer was not disclosed in the application seeking the appointment of Lappin or in the firm's supporting affidavit. The payment came to light only in January, 1975, when a section 60(d) motion was filed by counsel for the trustee to recover payments from Lappin to the extent they exceeded a reasonable amount. At the November 18, 1977 hearing on fee applications, the Chapter X trustee introduced documents disclosing payments to Lappin of $65,000 made during the Chapter XI proceedings for services rendered, and evidence of payments of $21,088.50 for reimbursement of expenses. None of these payments were made by authority of the Chapter XI court.

Lappin represented Arlan's in a controversy over a lease of premises in Columbus, Ohio. A settlement was agreed upon on July 31, 1973, pursuant to which Arlan's was to receive $66,781.25. Court approval of the settlement was obtained in an order dated August 6, 1973, which stated that the sum of $66,781.25 had to be paid in full and is "presently being held in escrow by [Lappin], pending the obtaining of the court's approval." Three months later Lappin remitted to Arlan's Columbus its own check for $41,781.25 retaining $25,000 as its fee. Lappin states that the application to settle the controversy was prepared by Ballon, and Lappin was not aware that its fee arrangement had not been disclosed. The order, however, was received on or about August 7, one day after its issuance, and the reduced remittance was not sent out until the following October. There is no conceivable justification for not advising the court of the fee arrangement and securing its approval to remit $41,000 instead of the full amount during the interval between Lappin's receipt of the court order and its remittance of the check to Arlan's. Another transaction involved payment of $40,000 to Lappin by Arlan's check dated November 2, 1973. No court authorization was sought or received for this payment. Apparently, the payment was for services rendered in ascertaining the status of Arlan's Realty Co. title to 7 parcels of real estate in Pennsylvania, Colorado, Iowa and Kentucky.

Finally, between July, 1973 and May, 1974, Lappin received 7 payments totalling $21,088.50 for reimbursement of expenses. Again, these payments are without court authorization and were not disclosed in Lappin's initial fee application filed in October, 1977—a clear infraction of Rule 10-215(a).

In its supplemental application Lappin contends that work was done and fees received from subsidiaries of Arlan's which did not file a Chapter XI petition, namely: Arlan's Department Store of Columbus, Inc. and Arlan's Realty Co. The statement in re the Columbus, Ohio transaction is unsupportable. Whether the matter was properly under Chapter XI, it was so presented to the court, and the court's order was clear and unequivocal. Lappin was required to turn over the entire amount received, or obtain approval from the court to keep $25,000. The explanation concerning the 7 parcels also will not suffice. The argument is that applicant handled the matter for Arlan's Realty which was not involved in the Chapter XI proceedings, and therefore, there was no need to obtain court approval to accept the fee. The funds, however,

were paid by Arlan's which was in Chapter XI, not Arlan's Realty which was not. Lappin states its inner office procedures were such that it did not know the funds came from Arlan's. That extraordinary explanation is simply unacceptable. The firm is under obligation to maintain internal procedures to alert it to situations of this kind. Nor can there be any justification for Lappin's acceptance, again without court authorization or disclosure, of 7 checks totalling $21,000 as reimbursement for expenses.

Lappin has requested a hearing in an application dated June 23, 1978. Frankly, I do not know precisely what that means. The Commission has filed an affidavit of service showing that its recommendations and supporting affidavit were served on separate counsel for Lappin, on June 6. A hearing was held on June 13 to receive the recommendations and hear any comments from the Commission or counsel. A further hearing date was set for June 30 to afford counsel any opportunity to present any evidence or argument. The opportunity accordingly was present at that time for Lappin to introduce any evidence it desired. It chose not to do so, and the court does not contemplate any additional hearings.

■ The $25,000 retained from Arlan's Columbus settlement, the $40,000 received for services rendered in connection with the real estate matters and the $21,088.50 obtained as reimbursement for expenses are all ordered returned to the estate with interest. Moreover, in view of the blatant character of the acts, no fee is allowed.

*The Application of the General Counsel for Chapter X Trustee*

General counsel has submitted its application for a final allowance of $950,000 in fees and $23,012.61 for reimbursement of expenses. The Commission's recommendation is for $800,000 in fees and $23,012.61 in disbursements.

The firm commenced its engagement on March 18, 1974, and has carried this case since that time without payment of fees or expenses. The Commission stated that the general counsel carried "the laboring oar

throughout and performed its duties competently," "is to be commended for its attempt at moderation," and is "entitled to reasonable compensation for its efforts." Between March 18, 1974, and September 30, 1977, general counsel spent some 18,795 hours on this matter. Of that time only 15% (2,881 hours) was charged to partners. The great bulk is charged to associates and some to paralegals. The Commission cites to the sparing use of partners' time as supporting its recommendation to cut the fee by $150,000. My own conclusion is somewhat different. Had the bulk of time been allocated to partners, I would have had serious doubts that general counsel had handled this assignment with economical efficiency. That the great bulk of time charges is that of associates means that the general counsel was making every effort to keep down costs to the estate. This is a concrete example of the attempt at moderation which the Commission commends and certainly affords no justification for paring the allowance further.

■ The Commission states that the matters were routine and seeks to downgrade some of the work done on the ground of a lack of benefit to the estate commensurate with the effort expended. It had been my understanding that a general counsel's fee application, unlike that of other applicants, was not to be judged on the basis of benefit to the estate. *See In re Farrington Mfg. Co., supra.* The general counsel's task is to provide the legal resources necessary to meet specific responsibilities, and performance of these tasks warrants fair compensation. It is true that much of the work done here was routine. However, counsel initiated settlements, established legal bases for termination of Arlan's employee pension plan and instituted a lawsuit against bank creditors—all of which resulted in recovery to the estate. All in all, the Commission details efforts by general counsel benefitting the estate by over some $5 million. The Commission, however, criticizes the effort spent on the *Vinar v. Cohen* litigation which brought in only $120,000 to the estate by way of a settlement which the court

ordered be accepted over the Commission's objections. Again, the Commission is using the improper standard of benefit to the estate in measuring the general counsel's fee application. Moreover, the Commission's analysis is confused. On the one hand it wishes to give general counsel minimum credit for all the hours spent because the recovery was so small, and yet it is on record as favoring the expenditure of more time on this litigation. Had that course been adopted, the recovery could have been the same or less. It might have been greater as well, but the only relevant consideration is that the time expended by general counsel was warranted under the circumstances.

There is no question raised that the time records substantiate the hours billed and the nature of services rendered, but the Commission states that entries were often lumped, reflecting total hours and assorted services without reference to the particular service. Quite frankly with the myriad services general counsel was called upon to perform, the exact specificity which the Commission seems to believe desirable is not possible, since several matters often and indeed generally had to be worked on simultaneously.

The general counsel has performed its services in an exemplary fashion. Indeed, it is the only major fiduciary in these proceedings about which that can be said. In my judgment, the Commission's recommendations fail to strike a balance between economy of administration and fair dealing with counsel. They tilt too far towards parsimoniousness to a degree which does general counsel an injustice. General counsel is a large prestigious New York law firm. The requested allowance reflects a discount of 20–25% from its normal billing rates. The Commission's recommendations would require a further discount of 16%, which would mean that general counsel would be in effect carrying the estate. The overall per hour rate being requested is $50.50 per hour, and as indicated ante the Commission has approved other applications which call for an hourly rate of $50 and $51. In view of services performed, a request for

an overall hourly rate of $50.50 from a firm of general counsel's experience and prestige seems to the court to be fair and reasonable. To allow the application requested in full would be in accord with the applicable yardstick of fairness and economy. Accordingly, general counsel is granted a fee of $950,000 and reimbursement of $23,012.61.

### The Application of Clarence Rainess & Co.

■■■ Applicants here are accountants retained under court order in both the Chapter XI and Chapter X proceedings. Each order specifies the hourly rates for services to be performed by applicants' personnel and the maximum amount to be paid for each engagement. The services performed were essentially a review of the tax forms of Arlan's and its subsidiaries, the preparation of tax returns and consultation. A total of 8,651 hours is charged for services rendered and the maximum amount allowed was exceeded on three engagements but applicant is not seeking compensation beyond the maximum set. The time records appear to be in order. Applicant seeks a final allowance of $224,851 of which $75,000 has already been paid, leaving a balance of $149,851. The allowance requested is approved.

### The Application of Main Lafrentz & Co.

■■■ Compensation of $7,477.50 for services and $715.45 for reimbursements of expenses is requested by the applicant. The firm of accountants was retained by court order of August 6, 1974. The services performed concerned preferential bank payments. A total of 213.25 hours was spent and is being billed at the rate of $35 per hour. The request seems reasonable and the requested fee is allowed plus $715.45 for reimbursement of disbursements.

### Application of Abe E. Freedman

■■■ Applicant has died since filing his application. Applicant was secretary to the creditors' committee and alleged that he spent 786.25 hours in his capacity as secretary and seeks to be compensated at $20 per

hour for a total allowance of $15,725. Applicant transmitted notices of creditors' meetings, attended 11 creditors' meetings and took the minutes for several such meetings. In addition, he transmitted proof of claims to creditors. Time records verify 211.25 hours, and the remaining 575 hours is alleged to have been spent reviewing proof of claims. These claims were necessarily reviewed by the Chapter X trustee's counsel, and applicant's effort was of no benefit to the estate. For these reasons and because there is no substantiation in time records in excess of 211.25 hours, the Commission recommends and the court agrees that a grant of $2,000 as a final allowance is fair.

### Application of Sidney S. Wolchok

■■■■ Applicant was Arlan's labor counsel prior to its bankruptcy and continued in that capacity throughout pursuant to court order. For these services a final allowance of $47,100 in fees and $960.72 in expenses is requested. Time records indicate 314 hours spent—230 hours by Wolchok, 77 hours by associates and 7 hours by secretary. Thirty hours are charged for travel. A secretary's time is not billable since it constitutes overhead, 6A *Collier on Bankruptcy*, ¶ 13.02 at 549 (14th ed. 1977), nor may an applicant be paid for travel time. *In re Polycast Corp.*, 289 F.Supp. 712, 719–20 (D.Conn.1968). The issues involved were important, concerning labor management problems involving several thousand employees. The problems were aggravated by store closings and the depressing state of Arlan's economic health. The services rendered, however, did not involve any litigation, arbitration or Labor Board proceedings, either national or state. The time records reveal that most of time is allocated to telephone calls of short duration. The services rendered seem to have been chiefly giving advice on how to deal with specific labor management issues and problems. Wolchok's fee request is equivalent to $150 per hour. This is certainly not out of line in private litigation, but it is excessive in this case. The Commission recommends a final allowance of $17,000. Considering the spe-

cialized nature of the services and delicate area involved, and the fact that an expert or specialist in labor matters does not generally have associates on hand with requisite skill and experience to whom to delegate any major responsibility in this area, I believe $20,000 is appropriate and fair, and the $960.72 request for reimbursement of expenses is granted.

### The Application of Silk, Slonim & Young, P. C.

■■■■ Applicant was litigation counsel throughout. It seeks $56,162.50 as final allowance for expenditure of 402.75 hours of billable time expended on the case, mostly by Silk. The request is equivalent to roughly $140 an hour. Applicant negotiated a settlement of $300,000 with Greenman Bros. Inc. involving a dispute over supplies, fixtures and lease payments on fixtures. Applicant seeks $225 per hour for work performed in bringing about this settlement. The other matters involved the institution of 13 cases and settlement or resolution of 22 others. Overall the estate benefitted by some $62,000.

The request is excessive. The Greenman matter had to be brought to a final conclusion by trustee's general counsel who also reached a better settlement than that reached by the applicant. The use of Silk in these matters was inefficient. Associates could have handled much of the work that Silk handled. The applicant should not be rewarded for inefficiency. The Commission recommendation of $25,000 seems fair and is adopted and $782.75 in expenditures is allowed.

### Application of Rice, Rice & Gilbert

■■■ This applicant was requested by Silk on August 7, 1973, to represent Arlan's interest in a dispute with Dianco, Inc., a Michigan licensee of Arlan's. Services rendered covered both Chapter XI and Chapter X, and a final fee allowance of $8,925 and $306.71 in expenses is asked for. In 1974 applicant instituted litigation in Michigan against Dianco seeking $100,000 recovery.

Dianco cross-claimed for $350,000 plus $1.8 million in punitive damages. The litigation was settled during Chapter X by mutual discontinuance of all claims by both sides. The disposition of a potential large claim against the estate was, of course, a benefit. The time sheets indicate 118.75 hours spent and thus the request is the equivalent of $75 an hour. Taking into account that general counsel for trustee and Silk also provided services in this matter and that the bulk of the time sheets are for telephone calls, the Commission recommends $6,000 plus reimbursement. This comes to $51 per hour which is generous in contrast to the Commission's per hour recommendation for the Chapter X trustee's general counsel. The court considers the recommendation fair, however, and accordingly awards $6,000 as fee and $306.71 for reimbursement of expenses.

*Application of Wolf, Block, Schorr & Solis-Cohen*

This firm was engaged by order of December 20, 1974, and on January 7, 1975, commenced a lawsuit against Lionel Leisure, Inc. seeking to recover for 28 cash registers Arlan's sold to Lionel. The case was settled for $41,160.06 against a recovery sought of $43,731.80. Applicant sets forth 34 hours of billable time expended and seeks recovery of $1,750 and reimbursement of $50.08. The fee sought is equivalent to $51.00 per hour. It seems reasonable. The matter was efficiently rendered and benefitted the estate. The $1,750 in fees and $50.08 in expenses are allowed.

*Application of Miller, Hickey & DeBruyne, Ltd.*

Applicant prepared a writ of attachment and participated in a number of conferences that resulted in the successful eviction of an Arlan's tenant. No back rent was recovered because the tenant itself became bankrupt. Time records show 18.75 hours spent for which a fee of $930 is sought. Application granted.

*Application of Rudofsky & Meo*

Applicant had been employed by Arlan's prior to Chapter XI proceedings to institute litigation against Bonanza Industries, an Arlan's licensee, and Bell Electronics Corp., a guarantor of the licensing agreement with Bonanza. The lawsuit sought a recovery of $23,250. By order of December 20, 1973, the applicant was authorized to continue to represent Arlan's interest. Applicant transferred the matter to Albert F. Coombes. No contemporaneous records were kept, and the time was reconstructed. The reconstructed time shows that of the expenditure of 27 hours claimed, half predated Chapter XI. The requested allowance is $1,340 in fees and $71.33 in expenses. Of those expenses $64.10 predated Chapter XI. These are not properly allowable as administrative expenses. Accordingly, $500 as fee is allowed plus $7.23 in expenses. The failure to file the verification required by local Bankruptcy Rule X–19 of this court has now been corrected, and the application is in order.

*Application of Albert F. Coombes*

Applicant seeks $862.50 for services in the Bonanza litigation. Applicant negotiated a settlement of the litigation for $8,000. The services performed benefitted the estate. The initial order authorized retention of local counsel, and while a new court order appointing Coombes would have been preferable, in view of the modest claim and positive recovery, the court authorizes the payment of the $862.50 requested. The required verification has now been filed correcting that defect in the application.

*Application of Frank Coyne*

This applicant was retained in connection with litigation in Wisconsin state courts prior to Chapter XI against a subsidiary of Arlan's and Arlan's Department Store of Dane, Inc. for malicious prosecution and defamation. A court order of December 21, 1977, was issued retaining applicant's services *nunc pro tunc* from the inception of Chapter XI proceedings. Appli-

cant eventually obtained a dismissal of the lawsuit. Applicant requests $3,871.25 in fees and $150.15 in disbursements. Of the fee requested $925 is for services prior to Chapter XI proceedings. The amount requested is modest and, with the exclusion of $925 for services and $35.30 in expenses predating Chapter XI, is allowed in the sum of $2,946.25 as fee and $114.85 in reimbursements. The verification required by our local rules has now been filed, and the application is now in order.

*Applications of Honigman, Miller, Schwartz & Cohen and Hurwitz & Hurwitz*

These applications are for services in filing and serving copies of Arlan's stay bankruptcy orders. Honigman handled one such matter in Michigan and Hurwitz handled 15 in Massachusetts. Hurwitz states that he performed the services at the request of the Chapter XI general counsel. There are no orders from the court. These are routine but necessary services and there is no reason to disallow them. Final allowance of $50 for fee and $13.46 for expenses is awarded Honigman and $750 is awarded Hurwitz. The required verified affidavits complete these applications.

*Ruben, Schwartz & Silverberg and Leinwand, Maron, Hendler & Krause*

Ruben, Schwartz & Silverberg and Leinwand, Maron, Hendler and Krause, as co-counsel for the creditors' committee have filed a joint application seeking compensation of $123,000 ($73,000 for Chapter XI services and $50,000 for Chapter X services) and $530.83 for reimbursement of expenses ($258.72 in Chapter XI and $272.11 in Chapter X). The application indicates that 729 hours were spent during Chapter XI and 450 hours in Chapter X.

The principal activity of the applicant in the Chapter XI phase was attending court hearings, examining documents and attending creditors' committee meetings. During the Chapter X proceedings the applicant's sole activity was to review documents and attend hearings, i. e. to monitor the Chapter X proceedings. Applicant played no other role during the Chapter X phase. It did initiate an appeal from the determination that the estate be liquidated in Chapter X but ultimately withdrew the appeal.

The Commission questions the accuracy of the time charged as spent in this matter. However accurate the figures may be of time spent, no benefit to the estate warranting $123,000 in compensation has been demonstrated. The Commission recommends a final allowance of $15,000. That seems somewhat on the high side, but applicant did represent the interests of creditors of the debtor and that role should not go entirely unrewarded. Of the reimbursement request $112.52 is for the cost of reproducing the fee application which obviously cannot be allowed. Accordingly, $15,000 is awarded as compensation and $418.31 as reimbursement of expenses.

In sum, the total allowance granted including $75,000 heretofore paid to Clarence Rainess & Co., is $1,258,117.25 in fees and $26,382.17 in expenses.

SETTLE ORDER.