MULLIGAN, Circuit Judge:
 

 Two law firms which acted respectively as general counsel and special counsel to a debtor-in-possession in a proceeding under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701-99, appeal from an order of the United States District Court for the Southern District of New York, Hon. Robert L. Carter, Judge, which denied both firms any fees and ordered the return to the estate of fees and disbursements which had been paid together with interest. The opinion of Judge Carter was filed on December 6, 1978, and is reported in 462 F.Supp. 1255. For the reasons set forth in this opinion we affirm the order of the district court.
 

 The debtor is Arlan’s Department Stores, Inc. (Arlan’s), which filed a petition for an arrangement under Chapter XI of the Bankruptcy Act (Act) on May 14, 1973. By order of Referee Roy Babitt, Arlan’s was permitted to continue the operation of its business as a debtor-in-possession. In June and July 1973, similar petitions were filed by forty of Arlan’s wholly-owned subsidiaries which were also authorized to continue business. The Securities and Exchange Commission (Commission) moved pursuant to section 328 of the Act, 11 U.S.C. § 728, to dismiss the Chapter XI proceedings and to require proceedings under Chapter X of the Act. The motion was granted for the reasons set forth in Judge Carter’s opinion of February 20, 1974 which is reported in 373 F.Supp. 520. The Chapter X Trustee was a party in the proceedings below and by order of this court dated May 21,1979, has filed a brief in support of the decision of the district court. The Commission is also a party to these proceedings pursuant to section 208 of the Act, 11 U.S.C. § 608 and has filed a brief on behalf of the appellee. The law firm which represented the debtor in the Chapter XI proceedings as general counsel is Ballon, Stoll and Itzler (Ballon), a New York firm with extensive bankruptcy expe
 
 *929
 
 rience. Special counsel for the debtor was Lappin, Rosen, Goldberg, Slavet, Levenson and Wekstein, Inc. (Lappin), a Boston firm which claims no bankruptcy experience but was retained because of its real estate and securities background. Both firms were authorized to file these appeals by order of this court on March 29, 1979.
 

 I. The Facts
 

 Arlan’s, incorporated in New York in 1957, was engaged in the business of conducting a retail discount store chain which by 1970 had grown to a peak of 119 stores in numerous states. In that year, Arlan’s began to experience heavy operating losses. By the end of April 1973, it reported losses of approximately $65 million for the preceding 314 fiscal years. By May 1973, it had closed 39% of its stores and had reduced its payroll by about 4000 employees. Cash flow was clearly inadequate and its cash position became critical. Arlan’s institutional lenders were owed some $21 million and refused to honor checks drawn on its accounts. Arlan’s was further indebted to the extent of $35 million to its trade creditors and faced potential claims of $15 million by the landlords of its subsidiary stores for rent defaults. On the advice of Ballon, Arlan’s filed a Chapter XI petition on May 14, 1973, and in the following two months similar petitions were filed by forty of its subsidiaries. During the Chapter XI proceedings Arlan’s economic condition continued to worsen. By late January 1974, some thirty-eight additional stores were closed and liquidated, operating losses of some $9.5 million dollars had been incurred and net losses of approximately $70.8 million had been suffered. A particularly disastrous project, prophetically called “Mission Impossible”, was undertaken without court approval in an effort to reap profits during the 1973 Christmas shopping season. Judge Carter found that it involved “huge expenditures of funds, time and effort”. 462 F.Supp.,
 
 supra,
 
 at 1259.
 

 These events prompted the Commission to seek Chapter X relief and, as we have indicated, Judge Carter granted the Commission’s motion in February 1974 over the strenuous objection of Arlan’s and its counsel. On January 29, 1975, the debtor was declared insolvent and the assets of all the ten remaining stores were liquidated. Bal-lon sought a total fee of $250,000 plus disbursements of $4,352.24. Judge Carter denied any allowance for compensation and directed that Ballon return to the estate, with interest, $129,993.98 which it had received from Arlan’s. Id. at 1266. Lappin applied for an allowance of $93,440 for fees and disbursements of $21,088.50. The court denied any fee and ordered that Lappin return to the estate, with interest, the sum of $111,088.50 which it had received in connection with the case. Id. at 1267.
 

 II. The Ballon Appeal
 

 The denial of the Ballon fee was based essentially on three grounds which we shall separately discuss.
 

 (a)
 
 The Prior Representation
 

 In 1971, about two years prior to the May 1973 filing by Arlan’s, Ballon had been retained by Arlan’s to determine whether a petition for an arrangement under Chapter XI of the Act should be filed. After a comprehensive review, Ballon determined that a petition at that time was not in the interest of Arlan’s or its general creditors. The propriety of that advice is not before us and is not an issue in these proceedings. For these services Ballon was paid a fee of $5,000. The parties have taken issue, however, with the fact that when Arlan’s Chapter XI petition was filed on May 14, 1973 seeking court authorization for the retention of Ballon as its general counsel, it was accompanied by an affidavit of Ballon’s partner Ronald S. Itzler which stated: “Neither your deponent nor any member of the firm has any connection with the above named debtor, its creditors, or any other party in interest, or their respective attorneys.” Itzler further indicated in the affidavit that “your deponent’s firm has never represented the debtor and has never represented any of the principals of the debtor.”
 

 In view of Ballon’s representation of Ar-lan’s two years before the affidavit was submitted in a matter which involved the
 
 *930
 
 very subject of the petition, the possibility of a Chapter XI proceeding, it is indisputable that the Ballon firm misrepresented its prior relationship with Arlan’s. Ballon suggests on this appeal that the prior dealing constituted a “consultation” and not a “representation.” This is a semantic quibble in which prospective counsel seeking confirmation by the court should not have indulged and which cannot be countenanced. The prior retention was not only concealed but positively denied in the affidavit. The misrepresentation is particularly disturbing since the Itzler affidavit alleges that the deponent and the Ballon firm “[have] had considerable experience in similar proceedings, and [have] on various occasions, in these matters, represented both creditors and debtors . . . .” We would expect that its familiarity with Arlan’s affairs would certainly have prompted Ballon to disclose the prior relationship and certainly not to deny that any such representation ever existed.
 

 There is another facet to Ballon’s prior representation of Arlan’s in 1971 which is particularly troublesome. On April 12, 1971, Ballon entered into a letter agreement with Finley, Kumble, Underberg, Roth & Grutman (Finley), a New York firm then acting as general counsel to Arlan’s. The agreement provided that in the event of a Chapter XI filing by Arlan’s, Finley would use its best efforts to cause Ballon to be retained by Arlan’s as its general counsel in those proceedings, and Ballon in turn would use its best efforts to cause Finley to be appointed as special counsel if such services were reasonably required. In addition Finley would retain all its fees as special counsel, but the Ballon fees would be shared with Finley. Ballon would perform approximately % of the services and keep % of the fee. Finley would perform
 
 Vs
 
 of the work and take
 
 Vs
 
 of the Ballon fee. The text of this mutual assistance pact is set forth in the margin.
 
 [1]
 
 The agreement was not dis
 
 *931
 
 closed in Arlan’s Chapter XI petition or in the Itzler affidavit. Judge Carter stated that had the agreement been disclosed, Bal-lon “would not have been confirmed as the debtor’s general counsel in the Chapter XI proceedings.” 462 F.Supp. at 1264. The court found that Ballon was obliged to disclose its prior representation of Arlan’s as well as the Finley letter when Arlan’s sought Ballon’s appointment as its general counsel.
 

 We reject at the outset Ballon’s position that the petitioner was Arlan’s and not Ballon and that the firm had no obligation to report anything to the court. The petition of Arlan’s was prepared by Ballon and the firm billed Arlan’s for its preparation. Moreover, the Itzler affidavit accompanying the petition denied any prior representation. It did not disclose the Finley agreement and Ballon makes no contention that Arlan’s was ever made aware of its existence. It seems highly unlikely that Arlan’s was privy to that agreement.
 

 General Order in Bankruptcy 44,
 
 [2]
 
 now superseded by Rule 215 of the Rules of Bankruptcy Procedure,
 
 [3]
 
 requires the debtor to set forth all of the connections between the attorney proposed for appointment as counsel to the debtor and the debtor and its attorneys. If the court is satisfied that the attorney to be appointed represents no interest adverse to the estate and if his employment would be “to the best interest of the estate,” the court may authorize his
 
 *932
 
 retention as counsel to the debtor. However, if without disclosure the attorney has represented any interest adverse to the debtor, General Order 44 provides that the court may deny the allowance of any fee, or the reimbursement of his expenses, or both. Upon finding a violation of the disclosure requirements of General Order 44, Judge Carter denied both fees and disbursements.
 

 Ballon would have us read General Order 44 to require disclosure only of present “connections” that are “adverse to the debt- or.” We do not read the language so narrowly. General Order 44 requires disclosure of “all of the attorney’s connections” with the debtor and his counsel. The prior retention of Ballon by Arlan’s was such a connection, and was detailed in the letter agreement between Arlan’s and Finley which was then Arlan’s general counsel. Ballon argues that every large New York firm has had prior relations with almost every other large New York firm, and to require the specification of all of these past associations would engulf the court in trivia. But the connection in this case was hardly trivia. It was fairly recent and related directly to Arlan’s financial condition which was the very issue before the bankruptcy court. It was a material matter and by no means inconsequential.
 

 General Order 44 does not limit the court’s discretion in confirming the selection of debtor’s counsel to a determination of whether adverse interests are involved. The court must also decide whether the appointment would be in the “best interests of the estate.” We do not read this additional requirement as mere surplusage. It is certainly not the intent of the Order that the petitioner or his prospective counsel may make a unilateral determination regarding the relevance of a connection. As the Ninth Circuit noted in
 
 In re Haldeman Pipe & Supply Co.,
 
 417 F.2d 1302, 1304 (9th Cir. 1969), it is the duty of counsel
 

 to reveal all of his connections with the bankrupt, the creditor or any other parties in interest. Had he made the disclosures then it would have devolved upon the court to determine whether conflicts existed. General Order 44 does not give the attorney the right to withhold information because it is not apparent to him that there is a conflict.
 

 The district court found the Commission’s position “that the [Ballon] agreement with Finley was patently improper certainly supportable.” 462 F.Supp. at 1264. On its face the agreement commits Finley to support Ballon’s candidacy for what was evidently a lucrative appointment in return for Ballon’s best efforts to secure Finley’s appointment as special counsel. Finley in turn was promised a third of the Ballon fee. Ballon describes the agreement euphemistically as a fee-sharing arrangement, permitted by the Code of Professional Responsibility (DR 2-107) since the division is made in proportion to the services performed and the responsibilities assumed by each firm. However we emphasize that this agreement also provided for mutual assistance in securing the respective appointments of Ballon and Finley. Those appointments were the prerogative not of counsel but initially of the client (DR 2-107(A)(1)) and ultimately of the court. While Ballon bridles at the suggestion that the Finley agreement constituted a trafficking in bankruptcy appointments, it is difficult to construe it in any other fashion. Certainly the ethical implications of the agreement were of sufficient weight that professional candor should have compelled Ballon to disclose its terms when the appointment was proposed.
 

 Aside from our view that the Finley agreement constituted a “connection” within the purview of General Order 44, we hold that Ballon breached a fiduciary duty to the bankruptcy court when it failed to disclose the agreement in its application for appointment. A bankruptcy court sits as a court of equity.
 
 Pepper v. Litton,
 
 308 U.S. 295, 304-05, 60 S.Ct. 238, 84 L.Ed. 281 (1939);
 
 In re: Beck Industries, Inc.,
 
 605 F.2d 624, 634-635 (2d Cir. 1979). Further, counsel for the debtor is an officer of the court and is bound by fiduciary standards.
 
 Brown v. Gerdes,
 
 321 U.S. 178, 182, 64 S.Ct. 487, 88 L.Ed. 659 (1944);
 
 Finn v. Childs Co.,
 
 
 *933
 
 181 F.2d 431, 441 (2d Cir. 1950) (“in all cases persons who seek compensation for services or reimbursement for expenses are held to fiduciary standards”). Ballon’s failure to recognize its fiduciary obligations to the court is best illustrated by its statements of June 27, 1978 submitted in reply to the Commission’s recommendations regarding Ballon’s final application for an allowance of fees. In its submission, the Commission had referred to the Ballon firm as “Court appointed officers” or a “Court appointed fiduciary.” Ballon’s reply papers stated: “The SEC well knows that our firm was retained by Arlan’s, the Debtor. Our retention by the Debtor was approved by Court order.
 
 However, in no manner whatsoever were we a Court appointed officer or fiduciary.”
 
 (Emphasis supplied).
 

 Ballon’s appellate counsel has not taken this position on this appeal. However it is Ballon’s conduct which is at issue. Ballon’s denial that it had any fiduciary obligations whatsoever of course explains its actions in the Chapter XI proceedings. But its position is untenable and it is indeed shocking that experienced bankruptcy attorneys would consider their relationship to the court or the estate of the debtor in such a light. As then Chief Judge Cardozo had long since observed, “[M]any forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties.”
 
 Meinhard v. Salmon,
 
 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). Moreover, Judge Swan stated many years ago for this court, in holding that the failure of a proposed attorney for a bankruptcy receiver to disclose a potential conflict justified denial of compensation under a local bankruptcy rule, that:
 

 Attorneys who seek appointment . owe the duty of complete disclosure of all facts bearing upon their eligibility for such appointment. If that duty is neglected, however innocently, surely they should stand no better than if it had been performed. ... If the rule is to have vitality and the evils against which it is aimed are to be eliminated, it should be enforced literally.
 

 In re Rogers-Pyatt Shellac Co.,
 
 51 F.2d 988, 992 (2d Cir. 1931).
 

 Ballon, which did not disclose the Finley agreement
 
 in limine
 
 when the propriety of its appointment was at issue, urges that it nevertheless did disclose the arrangement in an affidavit annexed to its fee application of February 1975. The disclosure of the Finley agreement made by Ballon at that time in an effort to comply with section 62(d) of the Act, 11 U.S.C. § 102(d),
 
 [4]
 
 is set forth in the margin.
 
 [5]
 
 Section 62(d) requires disclosure of any agreement or understanding which exists between petitioner and any other person for a division of compensation. Judge Carter
 
 *934
 
 held that the disclosure was inadequate under section 62(d) since it did not reveal the underlying arrangement with Finley. 462 F.Supp. at 1264. We agree. While Ballon does reveal that Finley brought an action for a forwarding fee because of its recommendation of Ballon to the debtor, it nowhere advises the court that the litigation was prompted by the 1971 agreement between Ballon and Finley. In fact the affidavit stated that “[n]o agreement or understanding exists between Ballon, Stoll & Itz-ler and any other person for the division of compensation . . . .” Ballon failed to bring the 1971 agreement to the attention of the district court until it learned that the Commission had a copy in February 1978. The agreement was finally disclosed in a letter to Judge Carter dated March 22, 1978, three years after the application for an allowance was filed.
 

 Ballon further argues that it was not required to disclose the 1971 Finley agreement because that agreement was intended to apply only to the possibility that Arlan’s might file a Chapter XI petition in 1971 and not to the 1973 petition. There is no such time limitation on the face of the agreement (see footnote 1,
 
 supra).
 
 Aside from this, when Finley brought the breach of contract action in the New York Supreme Court,
 
 [6]
 
 Ballon’s answer denied that Finley had made any recommendation to Arlan’s of Ballon as general counsel; it did not argue that the agreement was not binding in 1973. Further, Ballon’s second affirmative defense characterized the agreement as “unethical” under Canon 6 of the Canons of Professional Ethics (American and New York State Bar Associations), Canon 5 (Ethical Considerations 5-1 to 5— 20) of the Code of Professional Responsibility, and in violation of the public policy of the State of New York. Ballon raised this defense because it had discovered that at the time of the execution of the agreement, Finley represented and still did represent creditors and interests adverse to those of the debtor. The third affirmative defense interposed by Ballon set forth that any payment by Ballon to Finley would constitute a division of fees which would be unethical under Canon 34 of the Canons of Professional Ethics and Canon 2 of the Code of Professional Responsibility (DR 2-107). The law suit was settled by stipulation in April 1974, and Ballon paid Finley $22,500 in settlement of the claims.
 

 Aside from the mutual promises of professional assistance, the agreement when made contained the potential ethical problems raised by Ballon in the state court litigation. This emphasizes the materiality of the initial non-disclosure in May 1973 and the further failure to provide full disclosure in February 1975, plainly required by section 62(d). Ballon’s argument that the settlement of the dispute in 1974 superseded the initial 1971 agreement, and that the latter need not be reported thereafter, is disingenuous at best. Ballon contends that the disclosure of the settlement, without mention of the agreement which gave rise to the litigation, “affirmatively demonstrated Ballon’s desire to be completely candid with the court” (Ballon Brief at 37) and put the court on notice to make “inquiry (e. g. was there any writing)” (Id. at 36). These contentions misconstrue the obligations of an officer of the court. One could hardly expect the court to anticipate the unsavory agreement which led to the litigation. We are fully persuaded that Ballon’s fiduciary obligations, as well as General Order 44, mandated disclosure both of the prior representation and the Finley agreement. We are further persuaded that the February 1975 disclosure was insufficient under section 62(d). The district court properly decided these issues.
 

 (b)
 
 The $125,000 Fee
 

 When Arlan’s and Ballon discussed the retention of that firm to file the petition for arrangement and to become general counsel to the debtor in the Chapter XI
 
 *935
 
 proceedings, Ballon stated that it required a fee of $125,000 before it could undertake' that responsibility. It is not disputed that this amount was to cover not only Ballon’s pre-filing services but those to be performed in the future as well. Since Arlan’s checking accounts were blocked by its bankers, Arlan’s only recourse was to pay the fee in cash. On a Sunday night, the eve of the filing of Arlan’s Chapter XI petition, an Arlan’s representative lugged a satchel containing $124,993.98 in cash to the Ballon law office. Itzler, a Ballon partner, counted out five, ten and twenty dollar bills and apparently quarters, dimes, nickels and pennies as well. The money was collected from the receipts of several Arlan’s stores in Detroit, Michigan and flown to New York. The Chapter XI petition was filed the next day. This method of payment was admittedly unusual, but it also accentuated the critical cash situation faced by Ballon’s client, Ar-lan’s. While not finding anything untoward
 
 per se
 
 in the size of the fee or even the manner of its payment, Judge Carter nonetheless held that it should have been disclosed to the court at the outset of the Chapter XI proceedings. The payment was disclosed six months later when it was reported in Arlan’s consolidated schedules and statement of affairs filed on November 28, 1973. However, the court found the initial failure to disclose a violation of the “plain language” of General Order 44. 462 F.Supp. at 1263.
 

 We agree with Ballon that there is no explicit language in General Order 44 which requires the disclosure of an attorney’s fee arrangement with the debtor in the petition for appointment. The order, however, does require disclosure of all connections with the debtor, and the issue here is whether the $125,000 retainer is a connection with the debtor within the purview of General Order 44. Ballon urges that not only is it the custom of the bankruptcy bar to obtain fees in advance which cover both pre- and post-filing services, but that this custom has been explicitly approved by this circuit in
 
 In re Casco Fashions, Inc.,
 
 490 F.2d 1197 (2d Cir. 1973). That case also involved the Ballon firm, which accepted a $15,000 retainer before the filing of the petition. The referee ultimately determined that only $3,000 of that amount represented pre-filing services. As in the instant case, the Chapter XI plan was ineffective and was superseded by an ordinary bankruptcy proceeding. The issue on appeal was whether attorneys for the debtor-in-possession might be awarded compensation out of the estate for services rendered during the aborted Chapter XI proceeding. Id. at 1198. The trustee in that case had applied for a review under section 62(d) of the $15,000 fee. Ballon had cross-petitioned and applied for an allowance for its professional post-filing services. The district court, in reversing the referee, had held that Ballon was entitled to its fee under section 64(a)(1) of the Act. In affirming, Judge Friendly noted that the referee need not in every case fix compensation for post-petition services on a petition filed by the attorney for the debtor in response to one filed by the trustee under section 62(d). Ballon cites
 
 Casco
 
 to support the proposition that there was no impropriety in accepting a $15,000 retainer in a case where $3,000 was determined to be the appropriate fee for pre-petition services. We note here that, according to the undisputed contention of the Commission, Arlan’s would have been charged no more than $5,000 for the pre-petition services of Ballon, while the retainer was $125,000. The disparity between these two amounts is notably more glaring than in the
 
 Casco
 
 case. ' Such a distinction alone might suffice if
 
 Casco
 
 were on point. But it isn’t. In
 
 Casco
 
 the issue whether General Order 44 required disclosure of a retainer as a “connection” with the debtor was never raised. That point is not mentioned in the court’s opinion, nor does our examination of the briefs filed in that case reveal that it was argued by any of the parties.
 

 Furthermore, there is nothing in the record to support Ballon’s contention that it is the custom of the local bankruptcy bar to obtain a fee in excess of pre-filing services in Chapter XI cases. Even assuming that this is the custom, we read General Order
 
 *936
 
 44 to require a disclosure of the fee which has been paid by the debtor in circumstances revealed by this record.
 
 [7]
 
 The amount of the retainer, $125,000, represented one-half of the ultimate fee sought by Ballon, and was therefore clearly substantial. Further, the retainer was grossly disproportionate to thé $5,000 which Arlan’s would have been billed for pre-filing services according to Ballon’s own time charges. Finally, Arlan’s was in a desperate cash situation. The Trustee’s Report, pursuant to section 167(5) of the Act, 11 U.S.C. § 567(5), noted that after filing the petition, the debtor realized that it had almost no cash available to purchase merchandise. Its stores were insufficiently stocked and it had no funds during the winter or spring with which to purchase goods for the summer season. This led to the sale of 26 of the remaining 73 stores in order to raise cash for the remainder of the chain. The siphoning off of $125,000 from cash receipts of Arlan’s stores at this juncture should have raised a question in the minds of counsel as to its propriety.
 

 Again the Ballon reply submitted in response to the Commission’s adverse reaction to Ballon’s failure to report the $125,000 retainer in May 1973 is instructive. Ballon then commented: “By some method of twisted reasoning, the Commission has imposed upon a law firm a duty to ignore its own welfare for the sole and exclusive benefit of a
 
 prospective
 
 client.” However, the prospective client was about to embark upon a bankruptcy proceeding in which its attorneys fees unquestionably were subject to judicial review and scrutiny. It was not a venture involving simply attorney and client, but one in which the creditors of the bankrupt and the court had an undeniable interest. See
 
 In re J. M. Wells, Inc.,
 
 575 F.2d 329, 331 (1st Cir. 1978);
 
 In re Cook,
 
 17 F. 328, 330 (S.D.N.Y.1883). Moreover Bal-lon’s comment misses the mark entirely. We are not insensitive to the financial drain imposed upon a law firm which is about to undertake the arduous and complicated tasks here envisaged no matter how promising the prospects that the Chapter XI proceedings will eventually succeed. Again the question is not merely the sum taken but whether it should have been disclosed. The law firm is not expected to disregard its own welfare, but neither is it expected to ignore its obligation to advise the court so that the court might make the determination of propriety based on the circumstances in the case. The arguments made to support the receipt of the retainer should have been raised at the outset and not six months after the event.
 

 Ballon’s reply to the Commission further argues that it had fully discussed the retainer with Arlan’s and that the debt- or could have refused to pay and gone elsewhere for legal representation. It has long been recognized, however, that the bankrupt is faced with “the temptation of a failing debtor to.deal too liberally with his property in employing counsel to protect him in view of financial reverses and probable failure.”
 
 In re Wood and Henderson,
 
 210 U.S. 246, 253, 28 S.Ct. 621, 624, 52 L.Ed. 1046 (1908).
 

 Ballon maintains that it had fully complied with General Order 44 since it alerted the court to the fact that Arlan’s had retained Ballon, and retention presumes the payment of a fee. The argument that the retainer is no more than an element of the disclosed attorney-client relationship into which the court may inquire if it so desires before approving the appointment is meritless. This position reflects the persistent Ballon attitude of “That’s for me
 
 *937
 
 to know and for you to find out,” which we find totally incompatible with its fiduciary status as an officer of the court. Ballon protests that it has found no case in which General Order 44 has been construed to require disclosure of a retainer by counsel for the debtor-in-possession. Neither have we. Nor do we hold that such disclosure is always mandated by General Order 44. We do hold that, under the circumstances, disclosure was mandated here. In
 
 Meinhard v. Salmon, supra,
 
 249 N.Y. at 466, 164 N.E. at 547, Chief Judge Cardozo commented: “Little profit will come from a dissection of the precedents. None precisely is cited in the briefs of counsel. What is similar in many, or so its seems to us, is the animating principle.” The animating principle here is the fiduciary obligation owed by counsel for the debtor to the bankruptcy court. Those obligations are not limited in any way by the rules of bankruptcy where a breach of fiduciary obligation is found.
 
 In re Nazareth Fairgrounds & Farmers’ Market, Inc.,
 
 296 F.2d 678, 684 (2d Cir. 1961), rev’d on other grounds sub nom.
 
 Wolf v. Weinstein,
 
 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1962).
 

 (c)
 
 The Unreported $5,000 Fee
 

 The third incident which Judge Carter found to create an issue in these proceedings was Ballon’s receipt of a $5,000 cash fee from Arlan’s in July 1973. This payment was admittedly not disclosed in the schedules of the debtor filed on November 28, 1973 or in the allowance application filed by Ballon in February 1975. At a hearing on the application for allowances on November 18, 1977, counsel for the Chapter X Trustee introduced a receipt signed by Ballon’s partner Itzler, stating: “Received of Arlan’s Dept. Store, Inc. $5,000 for and on account of legal services rendered for and on behalf of its wholly owned subsidiaries.” Ballon admits receipt of the payment but claims that its nondisclosure was inadvertent. Judge Carter held that “[i]nadvertence is certainly not an apt description of what amounted to a direct violation of the duties and responsibilities of a Chapter XI general counsel.” 462 F.Supp. at 1263. The unauthorized payment was finally disclosed some four years after it was made.
 

 Ballon’s explanation for the receipt of this fee is contained in a letter to Judge Carter dated March 22, 1978. Ballon then stated that during the course of the proceedings it had learned “for the first time” that all of the purchases, payments to the suppliers and various other functions of Ar-lan’s were being conducted by three subsidiaries. “The filings for these three major subsidiaries had not been contemplated by the Debtor’s principals or our firm and consequently we asked that an additional retaining fee of $5,000 be paid to our law firm for filing the said Petitions.”
 

 On this appeal the position of Ballon is somewhat ambivalent. While urging that the amount involved was relatively minor and its omission inadvertent, at the same time it is argued that the payment was a perfectly proper retainer paid by a corporate entity which was not at the time engaged in bankruptcy proceedings. Again, however, Ballon’s explanation raises serious issues of credibility. The Chapter X Trustee points out that after filing the initial petition for Arlan’s for which Ballon’s time charges claimed some 40 hours, the application for fees listed only
 
 5%
 
 hours for the execution and filing of the next 37 petitions for subsidiaries, and only two hours for the final three for which $5,000 is now claimed to be a perfectly proper retainer. Each of the 37 petitions all prepared by Ballon recited: “The entire retail operation is operated as one unit and each of the subsidiary corporations are simple divisions or instrumentalities of the parent and have no factual separate corporate existence. All of the goods and services obtained by the subsidiaries are based upon the credit of the entire operation which constitutes but a single economic enterprise.” The same language appears in the petitions for the last three subsidiaries which it is now suggested were separate corporate entities paying a proper retaining fee. We also are compelled to note that in Ballon’s February 1975 application for fees, Ballon stated: “It
 
 *938
 
 must be noted that Arlan’s wholly owned subsidiaries paid nothing to your petitioners’ firm, it being the agreement of the parties that the single retaining fee paid by Arlan’s Dept. Stores, Inc. would be on behalf of all corporations.” We further add that the receipt of Itzler for the $5,000 cash retainer ran to Arlan’s, the parent, and that Ballon finally credited Arlan’s with a $130,-000 fee payment, not the $125,000 initially received.
 

 Ballon argues that even if the acceptance of the $5,000 fee is viewed as improper, and on the record before us that conclusion is inescapable, the sanction imposed to the extent that it depends on this retainer is extremely disproportionate. We note that while Judge Carter characterized the taking of the $5,000 as a “patent violation of the law and of Ballon’s obligations as an attorney,” he ultimately based his denial of the whole fee and his order that the money already received be returned with interest on “the totality of Ballon’s failure of full disclosure.” 462 F.Supp. at 1265.
 

 III. The Lappin Firm
 

 (a)
 
 The $25,000 Retainer
 

 On the recommendation of Ballon, Ar-lan’s petitioned the court for the appointment of Lappin, first as special counsel in real estate matters and later in security matters. Lappin acknowledged its expertise in these areas and Referee Babitt authorized the firm’s retention by orders dated May 18 and August 23, 1973. In an affidavit dated May 16, 1973 which accompanied Arlan’s petition for Lappin’s appointment as special counsel in real estate matters, Walter D. Wekstein, a Lappin partner, swore that his firm had never before represented Arlan’s, but also stated that the firm was specifically familiar with Arlan’s real estate problems and that the debtor had requested that Lappin “continue to represent it during these proceedings.” The Commission’s contentions that Lappin misrepresented its prior services to Arlan’s is therefore without merit. Referee Babitt was put on notice of Lappin’s previous service not only by the Wekstein affidavit but also by an affidavit of Ballon partner Itzler submitted in the same proceedings, which represented that Lappin had rendered legal services to Arlan’s in real estate matters and was familiar with “all such matters and the complexities of the debtor’s business and operations.” Itzler’s affidavit also stated that Lappin cannot “estimate the extent of the services they will have to perform during this proceeding . . . . Counsel will, however, be paid by the debtor-in-possession upon proper application for compensation having been made to the court.” Lappin had been paid $25,000 in cash on or about May 4, 1973 without any application to the court. The payment of this retainer was not disclosed by either Ballon or Wek-stein. The Wekstein affidavit stated:
 

 “It is impossible to ascertain at this time the extent of services which will be required of our firm during these proceedings and we are, therefore, unable to estimate the total compensation which we will seek. We understand that any compensation sought by us in connection with our legal services rendered to the debtor-in-possession will be subject to determination by this Court and the undersigned will make proper application therefor.”
 

 Considering Lappin’s familiarity with the financial woes of Arlan’s and its need for cash, professional candor clearly mandated full disclosure of the retainer in the application for appointment. This is especially so in view of Lappin’s acknowledgement at that time both of its inability to estimate the extent of future services to Arlan’s and its obligation to seek judicial approval of compensation sought. For the reasons we have already set forth in that portion of this opinion dealing with the Ballon firm, we hold that this failure to disclose under the circumstances was a violation of General Order 44. However the issue is exacerbated in the case of the Lappin firm since the retainer was not even disclosed in Ar-lan’s schedules and statement of affairs filed on November 23, 1973. Schedule B — 4 explicitly requires the disclosure of legal fees paid to counsel in the Chapter XI pro
 
 *939
 
 ceeding. Lappin’s explanations for this nondisclosure are that Arlan’s submitted the petition,
 
 [8]
 
 that Ballon prepared the petition and that Lappin never even saw the schedules, and that it was Ballon’s responsibility to file all necessary documents in the bankruptcy court. However, as we have already observed, the Wekstein affidavit of May 16, 1973 had acknowledged the firm’s understanding that “any” compensation sought by Lappin was subject to court determination and that “the undersigned [Lappin partner Wekstein] will make proper application therefor.”
 

 On this appeal, Lappin argues that “it had no experience in bankruptcy proceedings, nor was it knowledgeable about the rules concerning compensation in bankruptcy matters, or bankruptcy procedures generally.” (Lappin Brief at 9). In view of the Wekstein affidavit and Lappin’s undertaking to represent a debtor in a Chapter XI proceeding albeit as special counsel, the profession of ignorance is of course unacceptable. Lappin represented that it had a general practice, and if it was incompetent in bankruptcy matters, as it now urges, that fact either should have been brought to the attention of the bankruptcy court when Lappin sought the employment or Lappin should have immediately and assiduously undertaken a study of bankruptcy rules and procedures.
 

 Lappin’s receipt of the $25,000 cash retainer was not brought to the attention of the court until it applied for an allowance of $93,440 in October 1977. Lappin credited Arlan’s with the $25,000 fee but did not allude to the payment of any other fees. At the hearing on fees conducted on November 18,1977, the Chapter X Trustee also introduced documents which disclosed the payment of fees by Arlan’s to Lappin of $65,000 for services rendered during the Chapter XI proceeding as well as $21,088.50 for the reimbursement of expenses.
 

 (b)
 
 The $25,000 Fee for Services in Columbus, Ohio
 

 Arlan has leased property in Columbus, Ohio for a branch store and assigned that lease to its subsidiary Arlan’s-Columbus in 1963. The lease was to expire in 1982. In 1969, Arlan’s-Columbus, having ceased operations, sub-leased the premises to a local bank, with Arlan’s remaining as guarantor on the lease. Arlan’s-Columbus failed to pay rent to the landlord for the months of April and May 1973. On June 15, 1973 the landlord proceeded by motion in the bankruptcy court to terminate Arlan’s lease. Lappin negotiated a settlement among the parties executed by the landlord, the bank, Arlan’s and Arlan’s-Columbus (Arnold Blum, Arlan’s real estate director, signed for both Arlan’s and Arlan’s-Columbus). The agreement which is in the record provided that the bank would thereafter become the tenant of the landlord and further that the bank pay the Guarantor, Arlan’s, $66,781.25. According to its terms, the agreement was subject to court approval and it was approved by order of the bankruptcy court on August 6,1973 on the application of Arlan’s represented by Itzler. The order directed that the bank pay the settlement amount to Arlan’s-Columbus and further indicated: “Said sum has been paid, in full, and is presently being held in escrow by Barry E. Rosenthal, Esq. [a Lappin partner], pending the obtaining of this Court’s approval.” Instead of remitting the check for the full amount, two months later on October 26, 1973 Lappin forwarded to Ar-lan’s-Columbus a check for $41,781.25 (drawn on its “Clients Funds” account) and retained $25,000 for itself. The retention of this fee was never reported by Lappin and became known to the court when it was disclosed by the Chapter X Trustee at the fee hearing on November 18, 1977.
 

 Judge Carter found that there was “no conceivable justification for not advis
 
 *940
 
 ing the court of the fee arrangement and securing its approval to remit $41,000 instead of the full amount during the interval between Lappin’s receipt of the court order and its remittance of the check to Arlan’s.” 462 F.Supp. at 1266. We agree.
 

 Lappin again argues that the application for court approval of the settlement was made and prepared by Ballon, and that Lappin never received a copy of it and therefore did not know that it did not contain a disclosure of the contingent fee arrangement. (Lappin Brief at 18) Lappin does not deny, however, that it was aware of the court’s order directing distribution of the sum held in escrow by Lappin partner, Rosenthal. Lappin contents itself with the position that the bankruptcy court had erroneously assumed jurisdiction of the matter since Arlan’s-Columbus was a non-filing solvent subsidiary beyond the reach of the court. However, the settlement agreement signed by Arlan’s-Columbus and by a Lap-pin partner specifically provided that the agreement was subject to the approval of the referee in bankruptcy. Both Arlan’s and Arlan’s-Columbus agreed to use best efforts to obtain that approval. Moreover, Arlan’s application for approval indicates that a Lappin partner agreed to hold the settlement money in escrow pending the approval of the bankruptcy court. At the very least, Lappin should have made its jurisdictional argument to the bankruptcy court before taking its fee without any disclosure. We agree with Judge Carter that Lappin’s unilateral action was unjustified. It acted in fact with complete disregard for the order of the court. As the court noted, “Whether the matter was properly under Chapter XI, it was so presented to the court and the court’s order was clear and unequivocal.” 462 F.Supp. at 1266.
 

 Lappin contends that since its services were rendered to Arlan’s-Columbus, a non-filing subsidiary of Arlan’s, and not to the debtor, it was not required to seek court approval or disclose retention of the $25,-000. This argument is frivolous at best. While we need not reach the point, we note that there is nothing in the record to support any contention that Arlan’s-Columbus was anything more than a shell, a mere instrumentality of the parent. By its own admission, Lappin was engaged by the president and treasurer of Arlan’s to negotiate a settlement with the landlord and the bank, and it was they, not Arlan’s-Colum-bus, who orally agreed with Lappin for payment on a contingent fee basis. Moreover, Arlan’s-Columbus had been out of business since 1969. The profit from the sublease to the bank was reflected in the schedule of leases which were a part of
 
 Arlan’s
 
 Chapter XI petition. As we have pointed out before, Arlan’s Real Estate Director, Arnold Blum, executed the settlement agreement on behalf of both Arlan’s and Arlan’s-Columbus. The subsidiary was a mere conduit for the excess rent paid on the sublease, and in its supplemental application for fees, Lappin itself admitted that Arlan’s-Columbus “did not have any funds of its own.” Lappin’s reliance on
 
 Parkview-Gem, Inc. v. Stein,
 
 516 F.2d 807, 809 (8th Cir. 1975) and
 
 In re Beck Industries, Inc.,
 
 479 F.2d 410 (2d Cir.), cert. denied, 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973) to support the position that the court had no jurisdiction over the affairs of Arlan’s-Columbus is misplaced. In each of those cases, since the subsidiary was a viable, self-sustaining entity, independent of the debtor-parent, its property interests were not subject to the jurisdiction of the court. The district court is generally without jurisdiction over proceedings involving the property of a non-filing subsidiary, but where the subsidiary is a mere sham, conduit or alter ego of the parent corporation, “the corporate veil may be pierced and the separate entity may be disregarded . . . .”
 
 Parkview-Gem, Inc. v. Stein, supra,
 
 516 F.2d at 809; see 6 Collier on Bankruptcy ¶ 3.11 (14 ed. 1978) [hereinafter cited as Collier’s].
 

 While the record amply supports the position of the Commission and the Trustee that Arlan’s-Columbus was an empty shell, the district court made no finding on this point but rested rather on Lappin’s blatant disregard of the referee’s order to turn over the entire amount received in the settlement. So do we.
 

 
 *941
 
 (c)
 
 The $40,000 Fee
 

 For the first time at the November 18, 1977 allowance hearing, the trustee in the Chapter X proceeding informed the bankruptcy court that on November 2, 1973 the Lappin firm had received a $40,000 fee by check from the debtor-in-possession. No application was ever made by Lappin for court authorization of the payment of that fee. The payment was not disclosed in the schedules and statement of affairs filed by Arlan’s on November 28, 1973, nor was it reported in Lappin’s fee application of October 1977. Once again Lappin argues that the fee was earned for services rendered to a non-filing subsidiary of Arlan’s, in this case Arlan’s Realty, and was therefore not within the purview of the bankruptcy court. Lappin contends that this subsidiary held title to seven parcels of real property in Pennsylvania, Iowa, Colorado and Kentucky where Arlan and its subsidiaries operated stores. In its supplemental allowance application filed in March 1978, Lappin stated that it billed Arlan’s Realty for “a comprehensive review of the pertinent legal documents for the purpose of ascertaining and evaluating the then current status of each of said seven parcels regarding mortgage debt balance (which was in excess of 1.4 million in the aggregate), incumbrances, tenancy, and other relevant contracts and circumstances — including the pendency of the Arlan’s Department Stores proceedings.” Lappin argues that it could establish in an evidentiary hearing that the fee was equitable. But that is not the issue before us, and neither do we consider the argument of the Trustee and the Commission that Lappin was double billing parent and subsidiary for the same services. The issue here is whether the fee should have been disclosed and the approval of the bankruptcy court sought. Lappin’s receipt of the $40,000 fee was not discovered until four years after its payment, and then it was not revealed by Lappin, but by the Chapter X Trustee.
 

 Whether or not Arlan’s Realty had any separate corporate existence, the relationship between it and the debtor was certainly so close that Lappin unquestionably should have disclosed the $40,000 fee and made its argument concerning the separate and independent status of the subsidiary to the bankruptcy court at the time it billed Arlan’s Realty. We repeat that an attorney seeking a fee in a bankruptcy matter does have a fiduciary obligation to the court.
 
 Finn v. Childs Co.,
 
 181 F.2d 431, 441 (2d Cir. 1950). Regardless of its claimed ignorance of the bankruptcy rules and procedures, Lappin could not have been unaware of this fundamental principle. Moreover, we note again that Walter Wekstein, a Lappin partner, represented to the court that the firm would seek approval of any fees.
 

 The record before us clearly establishes Lappin’s lack of professional responsibility and the frivolity of its position that the $40,000 fee was unrelated to the Chapter XI proceeding.
 

 (1) In its response to the Commission’s recommendations on applications for final allowances and reimbursements of expenses, Lappin stated that the amount of the firm’s fee was agreed to not by the officers of Arlan’s Realty (if indeed any exist), but by Arlan’s President and “other top executives of Arlan’s.”
 

 (2) Lappin urges that it rendered a bill for its services to Arlan’s Realty. While this is so, the bill was addressed c/o Arlan’s Dept. Stores, Inc., Attn. Alan Cohen, the Treasurer of Arlan’s.
 

 (3) The Lappin bill carries the initials of the person who prepared and dictated it— WDW. An examination of the Lappin letterhead confirms that this could only have been Walter D. Wekstein, a Lappin partner, who at the same time was serving as Ar-lan’s secretary and director.
 

 (4) The check in payment of the $40,000 was drawn on the account of Arlan’s Department Stores, Inc., the parent, and not the subsidiary. We are told that no partner of Lappin ever saw the check when it was received at the firm; rather it was forwarded directly from a receptionist to the bookkeeper, and these are the only two who scrutinized it. But certainly Lappin’s books
 
 *942
 
 must have disclosed the payment of a $40,-000 fee, and its failure to uncover the source of payment for four years is inexcusable and, as the district court found, “simply unacceptable.” 462 F.Supp. at 1267.
 

 (5) The record indicates that the seven properties held in the name of Arlan’s Realty for which Lappin claims separate services were all listed in Arlan’s schedules and statement of affairs filed in November 1973 as real estate owned by the debtor Arlan’s. The mortgages on these properties were shown as debts of Arlan’s, and Arlan’s filed local tax returns for Arlan’s Realty as well as all its other subsidiaries.
 

 Our review of the record compels the conclusion that the $40,000 fee should have been disclosed and reported by Lappin.
 

 (d)
 
 The Reimbursement of $21,088.50 in Expenses
 

 Between July 1973 and May 1974 Lappin received from Arlan’s seven payments for claimed expenses which aggregated $21,-088.50. All of these payments were made by checks drawn on Arlan’s account and none were disclosed in Arlan’s schedules and statement of affairs filed on November 28, 1973. Nor were they revealed in Lap-pin’s initial fee application filed in October 1977. As in the ease of the $25,000 contingent fee and the $40,000 fee, they were brought to light by the Chapter X Trustee at the November 18, 1977 hearing on fee applications.
 

 Lappin did report in its initial application for the allowance of fees that it had received periodic reimbursement of expenses, but it did not itemize or indicate in any way the amount of this reimbursement, nor did it substantiate the expenses in any way. The district court found that the failure to seek court authorization of the seven payments amounted to a clear violation of Chapter X Rule 10-215(a). That rule requires that an application be filed with the court seeking approval of any compensation for services or reimbursement of necessary expenses. Again the issue here is not whether these payments were justified, but rather whether they should have been disclosed and court authorization for them sought. Lappin again contends that it assumed that Ballon would have obtained the court’s approval of this procedure if it were necessary. We reiterate that Lappin as a law firm had the professional obligation to make its own inquiry to determine when and how payments made by the debtor should be approved. The district court properly found that Lappin had violated Rule 10-215(a), which clearly requires approval of payments made by the debtor to attorneys in reimbursement of necessary expenses.
 

 (e)
 
 The Necessity for an Evidentiary Hearing
 

 Lappin finally argues that Judge Carter’s refusal to grant it an evidentiary hearing on its fee application constituted a denial of due process as well as an abuse of discretion, amounting to reversible error. When confronted with the evidence at the November 18, 1977 hearing that it had received over $86,000 in payment of fees and disbursements, Lappin, which was then represented by outside counsel Weil, Gotshal and Manges, stated that it would “stand on its application” and that if “any further information [was] required” Lappin would “promptly supply the court . . . with whatever might be wished.” The Commission made subsequent inquiry of Lappin and on March 2, 1978 Lappin filed a supplemental application in response to the Commission’s questions, in which it attempted to explain the undisclosed receipt of payments during the proceeding. On June 23, 1978, seven days before a hearing on objections to the Commission’s rec'ommendations, Lappin for the first time requested an evidentiary hearing. At the June 30, 1978 hearing which had been scheduled prior to June 23 on notice to Lappin, no Lappin partner was present, but outside counsel again appeared and renewed the request for an evidentiary hearing. Judge Carter repeatedly asked counsel for Lappin how an evidentiary hearing would help in view of the affidavits already submitted. The only specific issues raised by counsel at that point were that if
 
 *943
 
 the Lappin firm members involved were placed on the stand, the judge could evaluate their credibility and the Commission would have the opportunity to cross-examine them. No offer of proof was made at that time and as Judge Carter found in his opinion, “[t]he opportunity accordingly was present at that time [June 30] for Lappin to introduce any evidence it desired. It chose not to do so, and the court does not contemplate any additional hearings.” 462 F.Supp. at 1267. Under these circumstances, we believe that there was a waiver by Lappin of whatever right to a hearing it may have had.
 
 Fuller v. Laurens County School District No. 56,
 
 563 F.2d 137 (4th Cir. 1977);
 
 Satterfield v. Edenton-Chowan Board of Education,
 
 530 F.2d 567 (4th Cir. 1975).
 

 The ultimate fact is that Lappin failed to report substantial sums of money which it received from Arlan’s as fees or disbursements. This is not refuted or contested by Lappin. Lappin’s argument is that its initial cash fee was not within the requirements of General Order 44. No issue of the credibility of its partners is involved. The subsequent fees and disbursements received were admittedly not reported. Lappin claims ignorance of source, reliance on Bal-lon, and its lack of knowledge of bankruptcy procedures. Again the credibility of its partners is not at issue. Moreover, these excuses are meritless even if accepted at face value.
 

 Lappin urges that an evidentiary hearing would permit the firm to establish that the non-filing subsidiaries for which the services were allegedly provided were actually viable entities. This point was never raised before Judge Carter. The argument is frivolous anyway. The retention of the $25,000 fee was, as we have pointed out, violative of the court order. Even if the subsidiaries had a separate factual or corporate existence, their affairs were certainly so closely identified with the debtor Arlan’s, that ordinary professional prudence demanded that the question be raised before the bankruptcy court. It is further enlightening that even at this stage of the proceedings Lappin is unable even to suggest any indi-cia of separate vitality of the subsidiaries. The evidence in the record which we have detailed is entirely contrary.
 

 IV. The Remedy
 

 Both Ballon and Lappin urge that Judge Carter abused his discretion by denying all fees and ordering the return of fees and reimbursements paid with interest. There is no doubt of the inherent power of a bankruptcy judge to deny fees and disbursements where serious breaches of fiduciary obligations occur.
 
 Matter of Ranchero Motor Inn, Inc.,
 
 527 F.2d 1044 (9th Cir. 1975);
 
 In re Lucille’s Inc.,
 
 26 F.Supp. 943 (D.Me.1939); see 3A Collier’s
 
 supra,
 
 at ¶ 62.05[5],
 

 It is basic that we will not interfere with the district court’s assessment of the compensation to be awarded attorneys in bankruptcy proceedings absent a clear abuse of discretion.
 
 Dickinson Co. v. Cowan,
 
 309 U.S. 382, 389, 60 S.Ct. 595, 84 L.Ed. 819 (1940). Our review of the record in this case persuades us that there was no abuse of discretion here. We deal in this case not with isolated instances of oversight but with a total pattern of conduct which betrays a callous disregard of the professional obligations undertaken in these bankruptcy proceedings. Lappin oddly enough embraces the equitable doctrine of quantum meruit to justify the payment of “substantial and valuable” legal services. The record establishes that Lappin failed from the outset to fully report or substantiate its services. Its excuses which we have set forth if anything aggravate the matter. Ballon maintains that an affirmance of the holding below would create a novel doctrine and should be applied prospectively and not retroactively.
 

 Our opinion, however, is bottomed not simply upon violations of particular bankruptcy statutes or rules but upon the status of counsel to Arlan’s as officers of the court and fiduciaries. There is nothing novel at all about that consideration. In his first pronouncement from the woolsack in 1801, Lord Eldon expressed his deep concern over the abuses in bankruptcy proceedings which then prevailed. He commented: “Instead
 
 *944
 
 of solicitors attending to their duty as ministers of the court, for they are so, commissions of bankruptcy are treated as matters of traffic . . . 6 Ves.Jr. 1, quoted in
 
 In re Drake
 
 (D.C.N.J.1876), Fed.Cas.No. 4,058.
 

 One hundred years ago the Supreme Court referred to the professional obligation of attorneys as follows:
 

 They are officers of the law, as well as the agents of those by whom they are employed. Their fidelity is guaranteed by the highest considerations of honor and good faith, and to these is superad-ded the sanction of an oath. The slightest divergence from rectitude involves the breach of all these obligations. None are more honored or more deserving than those of the brotherhood who, uniting ability with integrity, prove faithful to their trusts and worthy of the confidence reposed in them. Courts of justice can best serve both the public and the profession by applying firmly upon all proper occasions the salutary rules which have been established for their government in doing the business of their clients.
 

 Baker v. Humphrey,
 
 101 U.S. 494, 502, 25 L.Ed. 1065 (1879).
 

 Measured by the standards set forth in this case, both firms here fell far short of that norm of professional integrity.
 

 Both firms complain that their professional honor has been impugned by the court below. Lawyers, however, must be in the first instance the guardians of their own reputations. Any blots on their escutcheons are self-inflicted, not court-created. In our view, Judge Carter would have been remiss had he failed to find otherwise, and the remedy he imposed is appropriate.
 

 Affirmed.
 

 [1]
 

 .
 

 April 12, 1971
 

 Messrs. Ballon, Stoll & Itzler 1450 Broadway New York, N.Y.
 

 Attention: Ronald Itzler, Esq.
 

 Re:
 
 Arlan's Dept. Stores, Inc.
 

 Gentlemen:
 

 The purpose of this letter is to confirm our understanding with respect to the rendition of professional services and the payment of fees therefor by the above named corporation in the event that the above named corporation shall file a petition for an arrangement or reorganization under the applicable provisions of the Federal Bankruptcy Act.
 

 (a)The undersigned agrees to use its best efforts to cause the firm of Ballon, Stoll & Itzler to be retained as counsel to the above named corporation and its subsidiaries and affiliates, in connection with any one of the above mentioned bankruptcy proceedings. It is agreed that the undersigned shall assist the firm of Ballon, Stoll & Itzler in connection with the rendition of such professional services. The parties hereto anticipate that the services rendered and to be rendered by the undersigned in assisting the firm of Ballon, Stoll
 
 &
 
 Itzler in connection with any of the foregoing proceedings will represent approximately 33‘/3% of the legal services required in connection with such matters on behalf of the petitioner.
 

 (b) Legal fees and disbursements received by Ballon, Stoll & Itzler in connection with the aforesaid proceedings will be divided between Ballon, Stoll & Itzler and the undersigned, as and when received, in the following manner:
 

 (i) there shall first be paid to Ballon, Stoll & Itzler any out-of-pocket disbursements incurred in connection with the aforesaid proceedings:
 

 (ii) there shall next be paid to the undersigned any out-of-pocket disbursements incurred in connection with the aforesaid proceedings;
 

 (iii) the balance of the fees received by Ballon, Stoll & Itzler shall be divided as and when received, on the following basis:
 

 33‘/3 to the undersigned
 

 662/3 to Ballon, Stoll & Itzler
 

 it being understood and agreed that the division of such fees shall be approximately in proportion to the services rendered and responsibilities assumed in connection with the aforesaid proceedings.
 

 (c) In the event that Ballon, Stoll & Itzler is retained as counsel to the above named corporation in connection with any of the aforesaid proceedings, they shall use their best efforts to cause the undersigned to be retained as special counsel to the above named corporation, to the extent and in the event that the services of special counsel shall be reasonably required. In such event all such services of special counsel shall be performed
 
 *931
 
 solely by the undersigned, and all fees and disbursements received by the undersigned shall be retained by the undersigned without division.
 

 (d) In the event and to the extent that the Court having jurisdiction over the aforesaid proceedings shall require Ballon, Stoll & Itz-ler to refund to the above named corporation, or its estate, any portion of the legal fees theretofore paid to Ballon, Stoll & Itzler, the undersigned shall make proportionate contribution to such reimbursement.
 

 If the foregoing conforms to your understanding of our agreement, kindly sign the enclosed copy of this letter under the words “Agreed To And Accepted”, and return it to the undersigned.
 

 Yours very truly,
 

 Finley, Kumble, Underberg, Persky & Roth Steven J. Kumble
 

 Agreed to and Accepted.
 

 Ballon, Stoll & Itzler By: (illegible)
 

 [2]
 

 . General Order In Bankruptcy 44, 11 U.S.C. following § 53 (1973):
 

 “Appointment of Attorneys
 

 No attorney for a receiver, trustee or debt- or in possession shall be appointed except upon the order of the court, which shall be granted only upon the verified petition of the receiver, trustee or debtor in possession, stating the name of the counsel whom he wishes to employ, the reasons for his selection, the professional services he is to render, the necessity for employing counsel at all, and to the best of the petitioner’s knowledge all of the attorney’s connections with the bankrupt or debtor, the creditors or any other party in interest, and their respective attorneys. If satisfied that the attorney represents no interest adverse to the receiver, the trustee, or the estate in the matters upon which he is to be engaged, and that his employment would be to the best interests of the estate, the court may authorize his employment, and such employment shall be for specific purposes unless the court is satisfied that the case is one justifying a general retainer. If without disclosure any attorney acting for a receiver or trustee or debtor in possession— shall have represented any interest adverse to the receiver, trustee, creditors or stockholders in any matter upon which he is employed for such receiver, trustee, or debtor in possession, the court may deny the allowance of any fee to such attorney, or the reimbursement of his expenses, or both, and may also deny any allowance to the receiver or trustee if it shall appear that he failed to make diligent inquiry into the connections of said attorney.
 

 Nothing herein contained shall prevent the judge, in proceedings under section 77 of the Act, from authorizing the employment of attorneys who are attorneys of the corporation, or associated with its legal department, in connection with the operation of the business of the corporation by a trustee or trustees under subsection (c) of section 77, when such employment is found by the judge to be in the public interest in relation to such operation and is not adverse to the interests of the trustee or trustees or of the creditors of the corporation.”
 

 [3]
 

 . Bankruptcy Rule 11-22 makes Rule 215 applicable in Chapter XI cases to,
 
 inter alia,
 
 the employment of attorneys for a debtor-in-possession.
 

 [4]
 

 . Section 62(d) provides:
 

 “A receiver or trustee or the attorney for any of them, or any other attorney, seeking compensation for services rendered by him in a proceeding under this title or in connection with such proceeding, shall file with the court his petition setting forth the value and extent of the services rendered, the amount requested, and what allowances, if any, have theretofore been made to him. Such petition shall be accompanied by his affidavit stating whether an agreement or understanding exists between the petitioner and any other person for a division of compensation and, if so, the nature and particulars thereof. If satisfied that the petitioner has, in any form or guise, shared or agreed to share his compensation or in the compensation of any other person contrary to the provisions of subdivision (c) of this section, the court shall withhold all compensation from such petitioner.”
 

 [5]
 

 . “[N]o agreement or understanding exists between Ballon, Stoll & Itzler and any other person for the division of compensation, and no division of compensation will be made by said firm, except as hereinafter set forth.
 

 “The Court must be advised that subsequent to the filing of the original Petition for an Arrangement herein, a lawsuit was brought against your petitioner’s firm ... by the law firm of Finley . . . The allegations of the complaint in said lawsuit alleged, among other things, that said law firm was entitled to a forwarding fee as a result of that firm’s recommendation of your deponent’s frm [sic] to the debtor in connection with these proceedings. Protracted litigation was had and the said lawsuit was settled by payment by your deponent’s firm of the sum of $22,500 to the law firm of Finley . . . .”
 

 [6]
 

 .
 
 Finley, Kumble, Underberg, Roth & Grutman
 
 v.
 
 Ballon, Stoll & Itzler,
 
 Supreme Court, New York County, Index No. 119-74.
 

 [7]
 

 . Ballon points out that shortly after the Chapter XI petition in this case was filed, Rule 219(b) of the Rules of Bankruptcy became effective, requiring an attorney for a bankrupt to disclose, on or before the first date set for a meeting of creditors,
 
 inter alia:
 
 “the compensation paid or promised him for the services rendered or to be rendered in connection with the case.” Ballon argues that this new rule would have been unnecessary if General Order 44 had required disclosure of the same information. We disagree. Where the size of the fee and the circumstances of its payment present an issue as to the suitability of counsel, the question deserves initial scrutiny of the court as a “connection” under General Order 44 (now Rule 215) and cannot be postponed until the first meeting of the creditors.
 

 [8]
 

 . We should note that Wekstein, the Lappin partner, became a director and secretary of Arlan’s on August 15, 1973. While the Commission urges that the date was May 18, 1973, the record as we read it does not substantiate that contention. The point in any event is that Lappin through its partner Wekstein is in an obviously difficult position to argue lack of knowledge of Arlan’s corporate posture and organization during the Chapter XI proceeding.