**In re AMERICAN THRIFT & LOAN ASSOCIATION, a California corporation, fka Interstate Thrift & Loan Association, Debtor.**

**Bankruptcy No. 90–04754–B11.**

United States Bankruptcy Court, S.D. California.

Jan. 31, 1992.

R.J. Coughlan, Coughlan, Semmer & Lipman, San Diego, Cal., for Saxon, Dean, Mason, Brewer & Kincannon.

Alan I. White, Drummy, King & White, Costa Mesa, Cal., for Thrift Guar. Corp.

Raymond F. Burg, Dept. of Corporations, San Diego, Cal., for Dept. of Corporations.

## ORDER ON APPLICATION FOR FEES AND COSTS

PETER W. BOWIE, Bankruptcy Judge.

This matter is before the Court on the final application of Saxon, Dean, Mason, Brewer & Kincannon (hereinafter, the firm) for fees and costs as counsel for the debtor. The application seeks $98,885.25 in fees and $32,782.40 in costs. Thrift Guaranty Corporation objects to allowance of any fees, on several grounds. Discovery was conducted and an evidentiary hearing was held, focused on the threshold question of whether any fees should be allowed. The Court and the parties deferred consideration of the issue of the reasonableness of certain fees. Following the hearing, the matter was taken under submission after receipt of simultaneously submitted proposed findings of fact and conclusions of law.

This case is an unusual one, and a brief review of its origins is warranted. At the time the petition in bankruptcy was filed, American Thrift & Loan Association was a state licensed thrift and loan regulated under the Industrial Loan Law by the Commissioner of Corporations. Thrift Guaranty Corporation was and is a nonprofit corporation created to guarantee certificates of investment up to a maximum amount at thrifts such as American.

California law required that thrifts licensed under the Industrial Loan Law obtain deposit insurance from FDIC on or before July 1, 1990, or close their doors. American applied for FDIC insurance, but the application was denied the end of May, 1990. In the meantime, the Commissioner commenced administrative proceedings against American which would normally culminate in a conservatorship. On June 6, 1990 American filed its petition under Chapter 11, freezing that process.

Within a week of the bankruptcy filing, American filed a notice of intent to distribute to certificate holders 25% of the balance of sums owed those holders. On June 22, 1990 American filed an ex parte motion for approval of the sale of certain assets. That motion was granted on June 28, 1990.

On July 2, 1990 the Commissioner of Corporations filed its motion to dismiss or to abstain, which was set for expedited hearing. Thrift Guaranty filed its own motion for substantially the same relief on the same date. On July 5, 1990 American filed a motion to sell certain FHA Title I loans.

By Order dated July 25, 1990 this Court filed its Report and Recommendation, that abstention should be ordered and the state proceedings be allowed to go forward, subject to a few conditions. One such condition was that the Court would retain jurisdiction to determine administrative claims. The present fee application is such a claim. For the foregoing reasons, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and General Order No. 312–D of the United States District Court for the Southern District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

One of the major assertions of Thrift Guaranty is that American sought the protection of the Bankruptcy Code for an improper purpose. Thrift Guaranty argues that it was always American's intent to liquidate its assets and any resulting deficit would be borne by Thrift Guaranty. Thrift Guaranty asserts that the real reason the bankruptcy was filed was to try to protect the principals of the debtor, rather than its creditors. In support, Thrift Guaranty introduced evidence of pre-filing discussions in which the debtor's principals, through counsel (the firm), offered to turn over the debtor to Thrift Guaranty in return for a waiver of any civil liability of the debtor's principals. In addition, there was some evidence that at least at the outset the principals also sought immunity from criminal liability. When those proposals were rejected by the Commissioner and Thrift Guaranty, the debtor filed for bankruptcy protection.

Testimony was received about other parts of some of the pre-bankruptcy discussions between the debtor's principals, counsel and a representative for the Commissioner, and Thrift Guaranty personnel. They included conversations about the ability of current management of American to liquidate assets of the debtor at the highest value, contrasted with sale of those assets by an identified liquidator, Thrift Guaranty. The firm represented American in the foregoing discussions.

■ Based on all the evidence adduced at the hearings, this court finds that the primary reason the bankruptcy petition was filed was to attempt to reduce or eliminate the exposure of the principals of the debtor for any losses which might result after liquidation, and the firm was aware of that reason. In itself, however, this Court is not persuaded that such a reason is necessarily improper. Indeed, if it were improper it is difficult to see how many Chapter 11 liquidation cases would be permissible.

In the instant case, the single most effective way for the debtor's principals to reduce or eliminate their exposure was to promptly liquidate the debtor's assets for maximum value. That is not inconsistent with the interests of the certificate holders or other creditors of American, even if their interests were only coincidentally considered in the determination to file bankruptcy.

Thrift Guaranty has argued that the debtor's principals wanted Bankruptcy court protection so they could obstruct and delay investigation of their conduct by the Commissioner and Thrift Guaranty. This Court is not persuaded. No evidence was offered to directly support such an allegation, and this Court believes that the debtor's prompt stipulation to appointment of an examiner with expanded powers without the need for a motion or hearing belies such an argument, or at least the firm's complicity in any such efforts.

■ Thrift Guaranty has also argued that fees should be denied because the firm was not disinterested, as required by §§ 327 and 101(14) of Title 11. The premise of this argument appears to be that payments received by the firm in the 90 days immediately preceding the filing of the bankruptcy *may* have constituted avoidable preferential transfers. Had the transfers been avoided, the firm would have had an unsecured claim for a pre-

petition debt and as a creditor would not have satisfied the statutory test of 11 U.S.C. § 101(14) for disinterestedness. It is true that § 101(14) states that a creditor is not disinterested, and it is also true that § 327(a) requires a professional to be disinterested in order to be eligible to be employed by the estate. Some courts take the strict view. Others, however, recognize that some flexibility is necessary. *In re Martin,* 817 F.2d 175 (1st Cir.1987).

This Court declines to conclude that a creditor can never be employed to represent a debtor under § 327(a). To hold otherwise would create multiple levels of problems. A person or entity contemplating bankruptcy would consult an attorney. Unless counsel dispenses advice pro bono, some fees will be incurred in counseling the client and preparing papers necessary for filing. If the client does not have the cash to pay the incurred fees prepetition, the attorney is a creditor. Conversely, if the client does pay the prepetition fees, but within 90 days of filing, Thrift Guaranty's position would be that counsel is ineligible because counsel received payment within the preference period and the transfer *might* be avoidable. Under such a rule, the only counsel eligible to be employed under § 327 would be counsel who took over the case upon filing, with no knowledge of the debtor, its affairs or its economic viability. Such a rule would be counterproductive as an absolute fiat, and this Court declines to adopt such a position.

In this Court's view, the central issue raised by Thrift Guaranty's opposition to the fee application concerns the disclosures not made by either the debtor or the firm in the application to be employed. At the time of their application, Bankruptcy Rule 2014(a) provided in relevant part:

An order approving the employment of attorneys ... pursuant to § 327 or § 1103 of the Code shall be made only on application of the trustee or committee, stating the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants.

Supplementing Rule 2014, the United States Trustee promulgated Guideline 3 which required an application to be detailed. In pertinent part it provides:

It must state whether the person to be employed is a disinterested person or holds or represents an interest adverse to the debtor or the estate. It must be accompanied by a verified statement of the person to be employed setting forth the person's connections, if any, with the debtor, creditors, and other party in interest, or their respective attorneys and accountants. The verified statement should not merely state legal conclusions, but it should set forth facts disclosing connections with the parties, past or present. It should also state whether the professional person rendered services within one year prior to the filing of the instant petition, the value of those services, when such services were paid and the source of such payment, to the best of his or her knowledge.

The firm has acknowledged that it did not make all the disclosures it should have included in its application to be employed.

As already noted, the petition in bankruptcy was filed on June 6, 1990. On June 26, 1990 the firm filed the application to be employed to represent American Thrift & Loan. The application recited in pertinent part:

4. The firm first became associated with Debtor in approximately March of 1986. The firm was originally retained to help Debtor with its litigation needs. Since that date, the firm has assisted Debtor with respect to the following: documentation of whole loan sales to other lenders, documentation of the Debt-

or's involvement with the sale, participation and servicing of Title I FHA insured loans, and acting as special outside counsel in helping Debtor deal with various regulatory agencies whenever Debtor deemed it appropriate.

Accompanying the application was the Declaration of Disinterest by attorney Brody of the firm. Paragraph 3 of the declaration was virtually identical to paragraph 4 of the application, set out above. Paragraph 2 of the Brody declaration stated:

That I am a shareholder in the law firm ... and that the firm ... has no connection with AMERICAN THRIFT & LOAN ASSOCIATION, the above named Debtor, its creditors or any other party in interest or their attorneys, which would adversely affect their representation of the Debtor as a Debtor in possession.

The United States Trustee had no opposition to employment of the firm and executed a written statement of position saying so. Based on the application, the accompanying declaration, and the Statement of Position of the United States Trustee, this Court authorized the employment of the firm, by Order filed July 9, 1990.

In the meantime, on July 5, 1990 the firm caused the filing of the Statement of Financial Affairs for American Thrift. Question 20 concerns "payments or transfers to attorneys." Subpart (a) asks if the debtor has consulted an attorney in the year preceding the filing. In response, the debtor put "(See Attachment)". Subpart (b) asks:

Have you during the year immediately preceding or since the filing of the original petition herein paid any money or transferred any property to the attorney, to any other person on the attorney's behalf, or to any other person rendering services to you in connection with this case? (If so, give particulars, including amount paid or value of property transferred and date of payment or transfer.)

Debtor's response to subpart (b) was: "See 20 above." The referenced attachment listed 7 firms or attorneys with total payments in a column to the right of the names. The firm was listed first and shown to have received $138,497.00 of a total of $153,564.00 for all 7. The attachment gave no indication of when any payments to any of the 7 firms or attorneys were made, or what the amount of any single payment was, although the question called for that information.

The Statement of Affairs also discloses that United Bancorp is the owner, sole shareholder of American Thrift. That fact was originally disclosed in the documents which comprised the initial filing of June 6, 1990, but it was not mentioned in the application for employment. In no document filed with the Court in the first months of the case was there any disclosure that the firm had provided representation to United Bancorp at least since 1988 in a number of matters, or that the firm was still representing United Bancorp in at least one matter. The application also did not disclose that the James W. Jones Companies owned United Bancorp, or that James W. Jones was chairman of the boards of directors of both American and United Bancorp.

The firm argues that its representation of United Bancorp did not constitute an actual or potential conflict of interest. In the context of the present application by the firm for fees and costs, this Court will not decide that question. That is an issue which would have been more directly addressed if disclosed in the initial application to employ counsel. Even so, this Court observes that American would have an interest in assessing whether it might hold claims against United Bancorp or James W. Jones for any shortfall. Because of the firm's representation of United Bancorp, there is a very real question about the firm's unfettered willingness to recommend to American pursuit of any such claim. Disclosure of the firm's representation of United Bancorp may well have impacted this Court's decision to authorize the firm to represent the debtor. See, e.g., *In re Grabill Corp.*, 113 B.R. 966, 969–970 (Bankr.N.D.Ill.1990).

A classic example of a potential conflict is set out in *In re Carrousel Motels, Inc.*, 97 B.R. 898 (Bankr.S.D.Ohio 1989). In that case, the firm representing the debtor also

represented the owner of the debtor. It was subsequently disclosed that the debtor had paid a $3.9 million dividend to its owner. The court concluded a conflict existed and disallowed the fee application. In the instant case, there has been no suggestion of any improper transfer of assets from the debtor to or for the benefit of United Bancorp, its owner. But the question must be asked whether a firm involved in such dual representation has the objectivity to look in such a direction for possible recovery of assets of the estate.

As already noted, this Court is not persuaded that the firm obtained authorization to represent the debtor by false pretenses, as Thrift Guaranty has argued. This Court accepts Mr. Kincannon's testimony that while he knew the firm had represented both United Bancorp and American Thrift, he did not realize that fact needed to be disclosed. Similarly, this Court accepts Mr. Brody's testimony that he did not know the firm had any connection with United Bancorp when he signed his declaration of disinterestedness. Also, the Court does not question Mr. Marr's testimony that while he knew United Bancorp was the owner, sole shareholder of American, he did not know the firm had any connection with United Bancorp. But that lack of knowledge does not eliminate the obligation to find out. James W. Jones was chairman of the board of directors of American, and also of United Bancorp. According to Mr. Kincannon, he knew that United Bancorp was owned by James W. Jones Companies. None of those ties were disclosed.

There is another reason this Court would have been concerned about authorizing the firm to represent the debtor if the firm's representation of United Bancorp had been disclosed. In the face of the risk of a shortfall, an entity such as United Bancorp, or an individual such as Mr. Jones, might have an inclination to attempt to move assets out of the reach of creditors or a trustee, whether by conversion to exempt status, transfer to bona fide purchasers, or dissipation. Authorizing representation of the debtor by a firm with any subjective reluctance to look in those directions at least theoretically increases the risk such efforts might be successful.

Similarly, prior to bankruptcy there may have been transfers of assets of the debtor to or for the benefit of United Bancorp, James W. Jones Companies, or James W. Jones. Whether those transfers might qualify as fraudulent transfers or preferential transfers, those assets may be gone if not promptly pursued. Counsel with divided interests may look in those directions later than objective, independent counsel, if at all.

It should be noted that these comments are not directed at the firm, as such, because the Court has not been provided with any evidence that anything similar has occurred. Rather, the comments are made to illustrate why disclosure is critical to any court's decision to authorize any law firm to represent a debtor.

There is a further point of concern to the Court about the non-disclosure of the firm's representation of United Bancorp. In a written declaration of Mr. Kincannon dated November 5, 1990 he stated that during the course of an exit review conducted by the Department of Corporations with *American's* board of directors, he learned that the Department of Corporations had concerns about a capital note offering by *United Bancorp,* and the firm was hired by *United Bancorp* to deal with those problems. At the evidentiary hearing, Mr. Kincannon testified that the firm was still representing United Bancorp on the capital note issue. That is detail which, if properly disclosed, would have impacted the Court's assessment of the firm's ability to independently and objectively represent the debtor.

Lest the foregoing discussion be thought totally theoretical, a problem did develop after Thrift Guaranty became the conservator of American. Thrift Guaranty demanded production of all of the firm's files concerning its work on American's affairs. Upon learning of the demand, James W. Jones, through separate counsel, demanded no such production be made. He did so while purporting to wear the dual hats of chairman of the board of American *and*

chairman of the board of United Bancorp. The firm had to file a complaint for interpleader and declaratory relief in state court in an effort to find a path out of the conflicting demands made on it.

An independent issue concerning the allowability of attorneys fees and costs exists in the form of the undisclosed payments to the firm by American in the 90–day period prior to the filing of the petition. In the context of this fee application, this Court will not decide whether one or more payments to the firm constituted voidable preferences. That determination would be reserved for an adversary proceeding, if one were brought. For purposes of this discussion, the issue is disclosure. *Diamond Lumber v. Unsecured Creditors' Committee*, 88 B.R. 773, 778 (N.D.Tx. 1988).

The evidence adduced at the hearings established that the firm received 14 payments from American, totalling $72,385.23, in the 90 days immediately preceding the filing of the petition, not including its $40,000 retainer. None of those payments, or the dates of them, were disclosed in the application for employment. Nor was any information provided about the dates of service and bills to which the payments corresponded. Consequently, neither the U.S. Trustee nor the Court could consider whether the fact of those payments might impair the firm's ability to objectively and independently represent the debtor. There is a concern that a firm so situated might not objectively assess whether any payment was voidable as a preference. Moreover, assuming the firm recognizes the problem, as it should, the firm may also hesitate to recommend that the debtor pursue other persons or entities similarly situated to recover assets for the benefit of the estate because the parallel circumstances might be recognized by the client or some third party.

It is true that Mr. Marr, in preparing the Statement of Affairs, disclosed that the firm had received over $138,000 from American in the year preceding the filing. But even then he did not provide the particulars, including the dates and amounts of each payment, as question 20 called for. More to the point:

> The disclosures must appear in the application and declaration required by Bankruptcy Rule 2014(a). It is not sufficient that the information might be mined from petitions, schedules, section 341 meeting testimony, or other sources.

*In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228, 236 (Bankr.E.D.Cal.1988). In the instant case, the Statement of Affairs was not filed until after the application for employment of the firm was submitted, so the information could not have been timely reviewed by the Court in any event. Mr. Marr also prepared the application for employment of counsel and the declaration of disinterestedness for Mr. Brody. Mr. Marr testified he obtained the scant information about the firm's prior representation of American from Mr. Kincannon. Yet knowing of the prior representation, he did not ascertain and disclose when or how much the firm was paid for that representation, even in the Statement of Affairs, which was filed after the application for employment was submitted.

Special mention of one of the fourteen payments should be made. It was in the amount of $10,000, was in the form of a cashier's check, and was picked up by attorneys Marr and Gardner at American's office enroute to file the bankruptcy petition. Mr. Gardner had earlier had a conversation with Mr. Kincannon about whether the firm could accept the $10,000 immediately pre-petition. Mr. Gardner advised that if it were for fees for contemporaneous services, as distinct from antecedent debt, it should not present a preference problem. None of the foregoing was disclosed in any document filed with the Court.

Again, the discussion is not totally theoretical. Thrift Guaranty propounded requests for admission to the firm. One request was:

> During the 90 days immediately preceding the filing of the bankruptcy with American Thrift and Loan Association, the firm received not less than $21,372.42

from American in past due payments for legal fees and expenses.

The response was: "The firm denies this request for admission but admits that approximately $15,000 was past due when paid." At the hearing, testimony was received concerning the history and pattern of payments of the firm's bills by American. This Court expresses no view on whether any payment constituted preference. But the facts brought out certainly raise the issue. Yet those facts, known best to the firm and to American, were not sought out by the firm or disclosed to the Court and the U.S. Trustee in the application to employ. The issue may also implicate 11 U.S.C. § 502(d), which neither side has broached.

The Court is mindful that virtually any firm a debtor seeks to employ will have performed some service pre-petition, even if only the preparation of the petition. In that event, the firm is either a creditor of the estate when it is created upon filing, or the firm has been compensated. As already discussed, if a firm has a claim for pre-petition services, it is not automatically disqualified from representing the debtor post-petition, notwithstanding the language of 11 U.S.C. § 101(14). *In re Martin*, 817 F.2d 175 (1st Cir.1987). Similarly, a firm which is paid prior to filing for its services is not necessarily disqualified. In both situations, full disclosure must be made so the court can assess the impact, if any, of the circumstance on the firm's ability to independently and objectively represent the debtor.

A number of courts have addressed the importance of disclosure in applications to employ counsel. In *Diamond Lumber v. Unsecured Creditors' Committee*, 88 B.R. 773 (N.D.Tx.1988), the court wrote:

Under Bankruptcy Rule 2014 and its predecessors, an attorney who seeks to represent the debtor must fully disclose at the time the application for employment is made all connections with the debtor, creditors, and other parties in interest. (Citations omitted.) All facts that may be relevant to a determination of whether an attorney is disinterested

or holds or represents an interest adverse to the debtor's estate must be disclosed to the court. (Citations omitted.) The duty to disclose is so broad because the court rather than the attorney must decide whether the facts constitute an impermissible conflict of interest.

88 B.R. at 776–777. *In re Haldeman Pipe & Supply Company*, 417 F.2d 1302 (9th Cir.1969); *Matter of Arlan's Dept. Stores, Inc.*, 615 F.2d 925 (2nd Cir.1979); *In re Coastal Equities, Inc.*, 39 B.R. 304 (Bankr. S.D.Cal.1984); *In re Guy Apple Masonry Contractor, Inc.*, 45 B.R. 160 (Bankr. D.Az.1984); *Matter of Roger J. Au & Son, Inc.*, 71 B.R. 238 (Bankr.N.D.Ohio 1986); *In re Film Ventures Intern., Inc.*, 75 B.R. 250 (9th Cir. BAP 1987); *In re D.L. Enterprises*, 89 B.R. 107 (Bankr.C.D.Cal.1988); *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228 (Bankr.E.D.Cal.1988); *In re Western Office Partners, Inc.*, 105 B.R. 631 (Bankr.D.Colo.1989).

The firm recognizes the foregoing and has acknowledged that it did not disclose all it should have in its application to be employed as general counsel for the debtor-in-possession. The essential dispute concerns what the consequences should be for the inadequate disclosure.

The cases recognize that counsel's failure to disclose may warrant denial of all fees and costs. In *In re Film Ventures Intern., Inc.*, 75 B.R. 250, 252 (9th Cir. BAP 1987), the court observed:

The failure of an attorney to disclose completely his connections with the Debtor is ground for denial of compensation wholly apart from the act of representing conflicting interests.

See, also, *In re Al Gelato Continental Desserts, Inc.*, 99 B.R. 404, 409 (Bankr. N.D.Ill.1989); *In re Western Office Partners, Ltd.*, 105 B.R. 631, 636 (Bankr. D.Colo.1989); *Matter of Roger J. Au & Son, Inc.*, 71 B.R. 238, 242 (Bankr. N.D.Ohio 1986); *Diamond Lumber v. Unsecured Creditors' Committee*, 88 B.R. 773, 777 (N.D.Tx.1988); *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228, 237 (Bankr.E.D.Cal.1988); *In re Guy Apple*

*Masonry Contractor, Inc.,* 45 B.R. 160, 163 (Bankr.D.Az.1984).

The firm argues that courts have discretion in determining what the consequence should be. Thrift Guaranty concurs on that conclusion. This Court also agrees. Although it was decided before enactment of the Bankruptcy Code, *In re Haldeman Pipe & Supply Company,* 417 F.2d 1302 (9th Cir.1969) is instructive. In that case, the court wrote:

> The order denying compensation concludes that appellant did violate General Order 44 and with that we agree, but the order then concludes that the violation "requires disallowance of any compensation to which he might be otherwise entitled." With that conclusion we disagree. Had the referee in his discretion and upon an appraisal of all of the arguments made by the parties such as the good faith of the appellant, the extent of his knowledge and the time of full disclosure, denied all fees, we would not be disposed to interfere with that exercise of discretion. The referee apparently believing that the General Order precluded it, failed to accord appellant a right to which appellant was entitled, i.e., the exercise of his discretion.

417 F.2d at 1305.

The firm argues that all or substantially all of its fees and costs should be allowed because the lack of disclosure was "unintentional and/or the undisclosed conflict was not material." In support, the firm cites several cases. The first is *In re Film Ventures Intern., Inc.,* 75 B.R. 250 (9th Cir. BAP 1987), in which the Bankruptcy Appellate Panel held it was not an abuse of discretion for the bankruptcy court to allow counsel's fees and costs. There is a significant distinction between that case and the instant one, however. In that case, counsel was employed for a special purpose pursuant to 11 U.S.C. § 327(e), and not as general counsel for a debtor-in-possession pursuant to § 327(a). As that court recognized:

> Section 327(e) contains less restrictive requirements than Section 327(a) which governs the employment of general coun-

sel as there is no requirement of disinterestedness.

75 B.R. at 252. As with any special counsel employed under § 327(e), usually there is also a general counsel employed under § 327(a), who could seek whatever relief was warranted from the conflict of special counsel. The same distinction applies in *In re D.L. Enterprises,* 89 B.R. 107 (Bankr. C.D.Cal.1988), also relied upon by the firm. In *In re Al Gelato Continental Desserts, Inc.,* 99 B.R. 404 (Bankr.N.D.Ill.1989), it is true that the court, in its discretion and after recognizing that it could properly deny all fees, chose to reduce the fees requested by 10%. However, that court also disqualified counsel from representing the debtor-in-possession. Other courts have taken a firmer stance, and denied all fees. *In re Western Office Partners, Ltd.,* 105 B.R. 631, 638 (Bankr.D.Colo.1989); *In re Carrousel Motels, Inc.,* 97 B.R. 898, 901 (Bankr.S.D.Ohio 1989); *In re B.E.S. Concrete Products, Inc.,* 93 B.R. 228, 237 (Bankr.E.D.Cal.1988); *Diamond Lumber v. Unsecured Creditors' Committee,* 88 B.R. 773, 779 (N.D.Tx.1988). In explaining its approach, the court in *B.E.S. Concrete* wrote:

> The ultimate determination of whether there is a disqualifying conflict and whether the representation is in the best interest of the estate lines [sic] within the discretion of the court. That exercise of discretion must be independent and informed.... Failure to disclose in this instance frustrated proper exercise of the court's statutory duty to rule on the propriety of employment.
>
> .    .    .    .    .
>
> Defective disclosure is not a minor matter. It goes to the heart of the integrity of the bankruptcy system, of counsel, and of the courts.... Appearances count. Even conflicts more theoretical than real will be scrutinized.

93 B.R. at 236.

In 1931, the Second Circuit Court of Appeals decided *In re Rogers–Pyatt Shellac Co.,* 51 F.2d 988. In that case, the court wrote:

Attorneys who seek appointment as counsel for an officer of the court owe the duty of complete disclosure of all facts bearing upon their eligibility for such appointment. If that duty is neglected, however innocently, surely they should stand no better than if it had been performed. In the present case, had the facts been disclosed, the appellants would not have been appointed counsel for the receiver. If the rule is to have vitality and the evils against which it is aimed are to be eliminated, it should be enforced literally.

51 F.2d at 992. That position was reiterated by the Second Circuit in *Matter of Futuronics Corp.*, 655 F.2d 463, 469 (1981). The *Futuronics* panel recognized that in a prior decision even "technical noncompliance with these disclosure requirements warranted a total denial of compensation." *Id.*

Obviously, at this juncture the issue of whether this Court would have authorized employment of the firm as general counsel for the debtor-in-possession under § 327(a) is viewed from a different perspective, looking back. This Court believes, however, that if the firm had fully disclosed what has since been established, the application for employment probably would have been denied. Notwithstanding that the application might have been denied, this court has discretion to decide what fees and costs, if any, should be allowed under all the circumstances.

In weighing that question, this Court is mindful that if the firm had simply forgotten to timely apply to be employed, and was now seeking a nunc pro tunc order of employment, the firm would have to show extraordinary circumstances. *In re Downtown Inv. Club III*, 89 B.R. 59, 63 (9th Cir. BAP 1988); *In re Kroeger Properties and Development, Inc.*, 57 B.R. 821, 822–23 (9th Cir. BAP 1986). Moreover, the firm would have to show that at all times it was eligible for employment under § 327(a). *In re Mahoney, Trocki & Associates, Inc.*, 54 B.R. 823, 826 (Bankr.S.D.Cal.1985). If a firm, otherwise eligible to be employed, does not timely apply and is unable to meet the extraordinary circumstances test for nunc pro tunc employment, the firm will receive no fees or costs.

■ Under all the circumstances of this case, this Court, in the exercise of its discretion, concludes that the request of the firm for the allowance of fees should be denied. The firm, through Mr. Kincannon and Mr. Marr, knew that United Bancorp was the owner, sole shareholder of American. But no attempt was made by Mr. Marr to ascertain if the firm had any relationship with United Bancorp. The only conflicts check performed concerned trade creditors, according to the testimony. The firm, including Mr. Marr, Mr. Gardner and Mr. Kincannon, knew of the $10,000 cashier's check payment made on the day of filing, but no disclosure of that payment was made in the application for employment. The firm, including Mr. Marr, Mr. Brody and Mr. Kincannon, knew that the firm had represented American at least since 1986, but did not disclose when or how the firm was paid for its services. At some point around the filing of the application for employment of counsel, Mr. Marr knew the firm had received over $138,000 in payments from American in the year immediately preceding the filing. But that information was not included in the application to employ counsel or otherwise disclosed to the Court and the U.S. Trustee. The rationale supporting the disclosure requirements of Bankruptcy Rule 2014 has been set out. The reasoning of the Second Circuit is persuasive: "If the rule is to have vitality and the evils against which it is aimed are to be eliminated, it should be enforced literally." *In re Rogers–Pyatt Shellac Co.*, 51 F.2d 988, 992 (1931). "It is no answer to say that fraud or unfairness were not shown to have resulted." *Woods v. City Bank Co.*, 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1944).

The Court reiterates, however, that it has not found any intent to deliberately conceal potentially disqualifying information. For that reason, it is the Court's intention to authorize payment of the reasonable expenses incurred by the firm during the course of its representation.

The firm's application seeks $32,782.40 in costs. As noted earlier, this Court deferred addressing the issue of reasonableness until the threshold issue was resolved. Thrift Guaranty shall have thirty (30) days from the date of entry of this Order in which to request a further hearing on the reasonableness of the costs. If no request is made within that time, costs in the amount of $32,782.40 will be allowed to the firm, with credit given for the $40,000.00 retainer. The unused portion of the retainer, $7,217.60, shall be remitted to Thrift Guaranty through its counsel of record. If a timely request for further hearing on the reasonableness of the costs is made, the amount of the allowed costs will be determined at such hearing.

IT IS SO ORDERED.